ROBERT S. BREWER, JR.
United States Attorney
JOSEPH P. PRICE, JR.
Assistant United States Attorney
Cal. State Bar No. 131689
BRIAN P. HUDAK
Special Assistant United States Attorney
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 546-7642
           (202) 252-2549
Facsimile:  (619) 546-7751
Email: Joseph.Price@usdoj.gov,
       Brian.Hudak@usdoj.gov

JOSEPH H. HUNT
Assistant Attorney General
MICHAEL D. GRANSTON
SARA MCLEAN
SAMUEL J. BUFFONE
CHRISTOPHER R.B. REIMER
JOHN W. BLACK
BRUCE D. BERNSTEIN
Attorneys, Civil Fraud Section
U.S. Department of Justice
601 D Street NW, Room 9219
Washington, DC 20004
Telephone: (202) 616-2945
Email: Samuel.J.Buffone@usdoj.gov

*Attorneys for the United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KEVIN G. DOUGHERTY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GUILD MORTGAGE COMPANY,<br><br>Defendant. | Case No. 16cv2909 (JAH/BLM)<br><br>**UNITED STATES' FIRST AMENDED COMPLAINT IN INTERVENTION AND JURY DEMAND**<br><br><u>JURY TRIAL DEMANDED</u> |

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................2

JURISDICTION AND VENUE .....................................................................7

THE PARTIES...............................................................................................7

THE FALSE CLAIMS ACT .........................................................................8

FACTUAL ALLEGATIONS .......................................................................10

    I.     FHA MORTGAGE INSURANCE PROGRAM. .........................10

         A.    Overview of the FHA Mortgage Insurance Program, the DE Program, and the LI Program.............................................10

         B.    Lenders Must Submit Truthful Certifications....................14

         C.    Lenders Must Use Qualified Underwriters.........................15

         D.    Lenders Must Perform Proper Due Diligence and Ensure Accuracy. .......................................................................16

         E.    Lenders Must Have a Quality Control Program, Report Material Deficiencies, and Correct Identified Problems. ..................................23

         F.    FHA Requires Lenders to Certify Their Compliance With Their Programmatic Responsibilities. ........................................26

         G.    Defaulted Loans Result in Losses to HUD.........................30

    II.    GUILD'S PARTICIPATION IN THE FHA PROGRAM...........31

         A.    Guild Directly Endorsed FHA Loans, Many of Which Have Defaulted, Requiring FHA to Pay Substantial Insurance Claims.......31

         B.    Guild Certified That it Complied With HUD Requirements to Gain and Maintain Eligibility in the DE Program. ............................32

    III.    GUILD CREATED UNDERWRITING PROCESSES AND PRACTICES THAT IT KNEW OR SHOULD HAVE KNOWN WOULD RESULT IN FALSE CLAIMS. ....................................33

- i -

A.      Guild Regularly Endorsed Loans for FHA Insurance that Did Not Meet FHA's Requirements. ......................................................... 33

B.      Guild Prioritized Aggressive Growth that Promoted Production Volume Over Loan Quality and Led to the Submission of False Claims to HUD ................................................................................... 35

C.      Guild Created an Underwriting Process That Encouraged a Disregard for FHA Requirements and Led to the Submission of False Claims to HUD. ........................................................................ 44

D.      Examples of False Claims Made by Guild to HUD. .......................... 47

E.      Guild's Wrongful Conduct Violated Specific HUD Rules and Requirements Governing the Origination and Underwriting of FHA Insured Mortgages. ................................................................... 66

IV.     GUILD'S QUALITY CONTROL PROCESS WAS GROSSLY INADEQUATE AND FURTHER EVIDENCES GUILD'S RECKLESS DISREGARD OF FHA REQUIREMENTS ............................ 69

A.      Guild's Quality Control Process Failed to Comply With Required Timelines. ............................................................................ 70

B.      Guild's Own Internal Branch Audits Revealed Patterns of Practice That Were Not in Compliance With FHA Regulations. ........ 75

C.      Guild Failed to Determine Its Defect Rate During the Lending Time Period. ...................................................................................... 78

D.      Guild Conducted Incomplete, Ineffective and Unstructured Trending Analyses That Failed to Address Underlying Underwriting Issues. ......................................................................... 81

E.      Guild's Investor Suspense Reports Indicated Patterns of Major Deficiencies in Its FHA Lending Practices ........................................ 85

F.      Failure to Disclose Known Violations to HUD as Required Under the DE Program ....................................................................... 87

V.      GUILD SUBMITTED AND CAUSED TO BE SUBMITTED FALSE CLAIMS FOR PAYMENT TO HUD ........................................................... 89

- ii -

COUNT I—VIOLATION OF THE FALSE CLAIMS ACT
    31 U.S.C. § 3729(A)(1) (2006) and 31 U.S.C. § 3729(A)(1)(A) (2010) ...............90

COUNT II—VIOLATION OF THE FALSE CLAIMS ACT
    31 U.S.C. § 3729(A)(1)(B) (2010) (formerly 31 U.S.C. § 3729(A)(2) (2006)) .....92

COUNT III—BREACH OF FIDUCIARY DUTY ...........................................................93

COUNT IV—BREACH OF CONTRACT.......................................................................94

PRAYER FOR RELIEF ...................................................................................................95

On September 8, 2014, Relator Kevin Dougherty ("Relator" or "Dougherty") filed his Second Amended Complaint in this action asserting claims on behalf of the United States of America ("United States" or "Government") under the *qui tam* provisions of the False Claims Act ("FCA") against Defendant Guild Mortgage Company ("Guild") and a claim against Guild on his own behalf under the anti-retaliation provisions of the FCA.

On February 18, 2016, the United States of America ("United States" or "Government") notified the Court of its decision to intervene and proceed with the False Claims Act ("FCA") causes of action brought by Relator as to the allegations that Defendant Guild Mortgage Company ("Guild") improperly underwrote and originated single family mortgage loans insured by the United States Department of Housing and Urban Development ("HUD"), through its component the Federal Housing Administration ("FHA"), that were endorsed for FHA insurance on or before December 31, 2011.  The United States declined to intervene in Relator's remaining FCA claims.

Relator has informed the United States that he does not intend to pursue the declined FCA claims in this matter, but does intend to pursue his retaliation claim against Guild. Accordingly, the United States, having intervened in this civil action and pursuant to Section 3730(b)(4)(A) of Title 31 of the U.S. Code and the District of Columbia Court's Order of February 29, 2016, filed a Complaint in Intervention against Guild on May 18, 2016 (D.D.C. ECF No. 20), which superseded Relator's previously filed complaints as to all allegations and claims brought on behalf of the United States under the FCA (but not as to Relator's retaliation claim brought against Guild on his own behalf).

The United States now amends its Complaint in Intervention against Guild and alleges as follows:

## **INTRODUCTION**

1.      The United States brings this civil action against Guild to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, and for damages under the common law for breach of fiduciary duty and breach of contract arising from harm sustained by HUD in connection with Guild's origination of residential mortgage loans underwritten and approved by Guild and endorsed for FHA insurance between July 1, 2007, and December 31, 2011 (the "Lending Time Period").   Unless otherwise stated, because the bulk of HUD's single-family insurance operations are conducted through FHA, the United States uses these terms interchangeably in this Complaint.

2.      Guild, a lender approved by HUD to originate and underwrite single-family residential mortgage loans insured by FHA, knowingly approved loans that violated FHA rules while falsely certifying compliance with those rules during the Lending Time Period. Guild's conduct allowed it to reap financial benefits from those loans, even if the borrowers defaulted on their mortgages, while placing all the risk arising from those loans on FHA - - a risk that resulted in tens of millions of dollars of losses to HUD.

3.      FHA promotes American homeownership through its "Direct Endorsement Lender" program or "DE Program".   Under this program, FHA insures loans so long as they satisfy certain requirements.  For these loans, FHA guarantees that mortgage holders

- 2 -

will suffer no loss if the borrower ultimately does not repay the loan. This program encourages lenders to extend loans to creditworthy low- and moderate-income families as well as first-time homebuyers.

4. Under the DE Program, lenders known as Direct Endorsement Lenders (or "DE Lenders") apply for the responsibility to determine whether loans satisfy the requirements for FHA insurance. Because DE Lenders are permitted to endorse loans for FHA insurance without prior HUD review, HUD requires these lenders to conduct due diligence on loans before endorsing them for FHA insurance and relies on the truthfulness of such lenders' loan specific certifications in extending mortgage insurance. Any lender participating in the DE Program is expected and obligated to act with good faith, honesty, and fairness in its dealings with HUD.

5. HUD's underwriting requirements ensure that creditworthy borrowers are able to handle monthly mortgage payments and become lasting homeowners while also protecting HUD and the taxpayers from improperly underwritten and unduly risky loans. Guild's underwriting of ineligible loans and false certifications of compliance with applicable requirements undermined these objectives, harming homeowners, the housing market, and the public fisc.

6. Guild failed to meet the obligations of its participation in the DE Program, and its management instituted and encouraged practices that led underwriters to violate HUD rules and to approve ineligible loans.

- 3 -

7.     In 2007, Guild's senior management partnered with McCarthy Capital for a management buyout and thereafter grew the company exponentially during the Lending Time Period.  Indeed, Guild's originations almost doubled between 2007 and 2008 and more than doubled between 2008 and 2009.  During these years of massive growth, Guild's top management consistently prioritized financial profits at the expense of prudent underwriting.

8.     Guild accomplished its rapid growth through aggressively recruiting and purchasing new branches to originate more loans.  But Guild's audits of its branches showed consistent patterns of risk emerging from the branches.  More than a third (39 percent) of its branches during the Lending Time Period were found to impose a "serious impact or risk to Guild" and Guild auditors discovered "serious concerns" about certain branches' lack of knowledge and/or controls.

9.     Guild established a culture that valued getting a loan approved and endorsed for FHA insurance over complying with FHA's rules.  Guild's aim was to shift risk from Guild to HUD on the mortgages it originated while making profits on those loans largely by selling them to institutional investors.

10.     Guild allowed and encouraged reckless origination and underwriting practices in the pursuit of growth including waiving mandatory conditions during the underwriting of FHA loans, allowing unqualified junior underwriters without DE certifications to underwrite FHA loans, performing untimely and incomplete quality control reviews, and ignoring quality control findings.

- 4 -

11.     Guild's own quality control vendors found significant deficiencies in 21 percent of the FHA loans they reviewed during the Lending Time Period and found over half the FHA loans reviewed during the Lending Time Period contained significant or moderate deficiencies, including violations of FHA underwriting requirements.

12.     Guild allowed its underwriters to waive required loan conditions, including conditions that were mandatory FHA requirements. These conditions could be and were waived in an underwriter's discretion without any review or approval by management.

13.     Guild also created a position called a "junior underwriter" to assist DE certified underwriters.  On FHA loans that Guild manually underwrote, where FHA requires all underwriting by a DE underwriter, Guild allowed junior underwriters to clear underwriting conditions.  While the use of junior underwriters itself violates FHA requirements, Guild's practices further compounded its violations as junior underwriters often ignored and violated FHA guidelines when clearing conditions.

14.     Guild was aware of its systematic problems, but ignored the problems and failed to take appropriate steps to remedy them consistent with its obligations to HUD. Indeed, Guild implemented a quality control process that failed to adequately assess its compliance with FHA requirements.  Guild consistently performed quality control late and failed to report quality control results to management in many quarters during the Lending Time Period.

15.     Despite having an obligation to report all materially defective loans to HUD, Guild did not report a single underwriting deficiency to the agency during the Lending

Time Period, even though materially defective loans were identified by Guild employees. Indeed, during the Lending Time Period, Guild opted to hide its underwriting problems from HUD rather than disclose them.

16.     Guild's knowledge of its poor underwriting practices derived not just from its internal audits and deficient quality control processes.  Guild regularly received reports from institutional investors identifying the poor quality of its loans, including FHA loans. The findings in these reports often resulted in investors requesting Guild to re-purchase loans it had sold due to underwriting issues, including failures to meet FHA's mandatory requirements.  Despite learning of these issues, Guild did not engage in any systematic effort to improve its underwriting, allowing its poor underwriting and its specific FHA violations to fester.

17.     Guild's systemic underwriting and quality control problems persisted until 2013 after Fannie Mae conducted an audit and found Guild's corporate governance weak and ineffective such that "immediate improvements are needed to mitigate risks."  Fannie Mae found major deficiencies that had persisted throughout the Lending Time Period.  The deficiencies included that Guild did not perform timely quality control audits, Guild did not identify an overall defect rate and therefore could not properly track its loan quality, Guild failed to review the work of its quality control vendor, and Guild failed to ensure underwriters responded to quality control findings.  Although these general findings implicated Guild's compliance with FHA requirements, Guild did nothing to report these findings to HUD.

- 6 -

18.     Guild's defective lending practices caused hundreds of improperly underwritten loans to be endorsed for FHA insurance where the loans did not satisfy HUD's requirements and where the borrowers ultimately did not repay the loans.  These ineligible loans endorsed by Guild have resulted in tens of millions of dollars in existing losses to HUD and many additional loans underwritten by Guild are currently in default and will likely result in significant additional losses to the agency.

## JURISDICTION AND VENUE

19.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733, and the common law.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

20.     This Court has personal jurisdiction over Guild because the State of California is Guild's state of incorporation and principal place of business.

21.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. §1395, and 31 U.S.C. § 3732(a), because Guild can be found and transacts business within the Southern District of California, including having its corporate headquarters and principal place of business in this District.

## THE PARTIES

22.     Plaintiff the United States of America, through HUD and its component FHA, promotes American homeownership including by improving housing standards and conditions, providing adequate home financing system through insurance of mortgage loans, and stabilizing the mortgage market.

- 7 -

23.     Defendant Guild Mortgage Company is a corporation incorporated under the laws of the State of California.  Guild originates and underwrites residential mortgage loans for properties in forty-three states and the District of Columbia.

24.     Relator Kevin Dougherty was formerly Guild's Quality Assurance Manager from 2010 through 2014 when he was fired.

## THE FALSE CLAIMS ACT

25.     Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the False Claims Act is the primary tool with which the United States combats false or fraudulent claims against the Government and protects federal funds.  The Supreme Court has held that the False Claims Act's provisions must be construed broadly to reach all types of fraud, without qualification, that might result in financial loss to the Government.

26.     The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1) (2006); 31 U.S.C. § 3729(a)(1)(A) (2010).

27.     The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B) (2010).  The prior version of the false statements provision made liable any person who "knowingly makes, uses, or causes to be

Case No. 16cv2909 (JAH/BLM)

made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2) (2006).

28.   The False Claims Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(A) (2010).  The False Claims Act provides that no proof of specific intent to defraud is required.  31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(B) (2010).

29.   Before May 2009, the False Claims Act defined the term "claim" to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(c) (2006).

30.   Effective May 20, 2009, the False Claims Act now defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that– (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government– (I) provides or has provided any portion of the money or

- 9 -

property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A) (2010).

31.     The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act.

32.     Any person who violates the False Claims Act "is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).

## FACTUAL ALLEGATIONS

## I.     FHA MORTGAGE INSURANCE PROGRAM.

33.     Due to its size and to further homeownership opportunities for taxpayers, the FHA mortgage insurance program necessarily relies on lenders in making and insuring FHA loans to act responsibly, exercise due care, comply with FHA requirements, and make truthful certifications.

### A.     Overview of the FHA Mortgage Insurance Program, the DE Program, and the LI Program.

34.     HUD is a cabinet-level agency of the United States.  Its mission is to create strong, sustainable, inclusive communities and quality affordable homes for all.  HUD works to strengthen the housing market to bolster the economy and protect consumers,

- 10 -

1   meet the need for quality affordable rental homes, utilize housing as a platform for

2   improving quality of life, and build inclusive and sustainable communities free from

3   discrimination.

4          35.    FHA is a part of HUD and is one of the largest mortgage insurers in the world.

5   Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance

6   programs that have insured more than 40 million home loans since FHA's inception.

7   Through some of these mortgage insurance programs, FHA provides insurance against

8   losses on mortgage loans to single family home buyers originated and held by approved

9   lenders, or mortgagees.

10          36.    If a homeowner defaults on an FHA-insured mortgage, the holder of the

11   mortgage may submit a claim to HUD.  HUD will then pay the mortgage holder the

12   outstanding balance on the loan and other costs associated with the default.  The mortgage

13   holder therefore suffers no loss when a borrower is unable to repay an FHA-insured

14   mortgage.  This no-loss guarantee encourages lenders to make loans to creditworthy

15   applicants who would otherwise have difficulty qualifying for conventionally available

16   financing on favorable terms, including the ability to put little money down to make the

17   purchase.  FHA mortgage insurance programs therefore help many creditworthy moderate-

18   and low-income families as well as first-time homebuyers become homeowners.  The DE

19   Program is voluntary and gives lenders access to borrowers and revenue streams lenders

20   would be unlikely to access without the support of HUD programming and FHA insurance.

21

22

- 11 -

37.   A lender must apply to be a DE Lender and must be approved by HUD to underwrite FHA-insured mortgage loans on HUD's behalf.   This is an important responsibility because HUD "does not review applications for mortgage insurance before the mortgage is executed."  24 C.F.R. § 203.5(a).  Instead, the DE Lender underwrites mortgage loans on HUD's behalf and determines whether a borrower presents an acceptable credit risk for HUD.   In underwriting the mortgage loan, the lender must determine whether the borrower and the mortgage loan meet HUD's requirements for FHA insurance and whether the "proposed mortgage is eligible for insurance under the applicable program regulations."  *Id.*  The DE Lender must decide whether or not to approve the borrower for an FHA-insured mortgage loan.  In doing so, the DE Lender must exercise the same level of care it would exercise for a loan where it depended only on the value of the property as security to protect its investment.  24 C.F.R. § 203.5(c).  Pursuant to its statutory authority, HUD has published guidelines for Direct Endorsement underwriting procedures in a handbook for distribution to DE Lenders.  *Id.*  "Compliance with these guidelines is deemed to be the minimum standard of due diligence in underwriting mortgages."  *Id.*  Mortgagees must evaluate the mortgagor's income "in accordance with applicable regulations, policies and procedures," 24 C.F.R. § 203.5(d), and must have the property appraised "in accordance with such standards and requirements as the Secretary may prescribe," 24 C.F.R. § 203.5(e).

38.   After the DE Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA

- 12 -

insurance, meaning that the mortgage loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan.  The DE Lender must certify that the loan meets all of HUD's requirements and HUD relies on this certification to endorse the loan for FHA insurance.

39.     Certain DE Lenders apply to, and participate in, the Lender Insurance ("LI") program (the "LI Program") in which the mortgagees themselves endorse the mortgage for FHA insurance and retain all documentation supporting the mortgage.  24 C.F.R. § 203.6. These lenders typically have a history with HUD and are experienced with FHA lending and so are afforded greater responsibility based on previous representations to HUD. The lender retains the documents necessary to approve the loan (the FHA "case binder") and remits the documents to HUD only upon request.  *See* Mortgagee Letter 2005-36.

40.     A DE Lender is expected and obligated to act with the utmost good faith, honesty, and fairness in its dealings with HUD.  The mortgagee, knowing that the federal insurer is relying on its professional judgment in a business relationship, has an affirmative duty to use due care in providing information and advice to the federal mortgage guarantor. As a result, in addition to the regulatory duties addressed below, the DE Lender owes both a fiduciary duty and a duty of reasonable care to HUD.

41.     Put another way, HUD grants DE Lenders responsibility for determining which loans qualify for FHA insurance.  In granting this control and responsibility to the DE Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge,

- 13 -

good faith, integrity, and candor.  HUD therefore enters into a fiduciary relationship with the DE Lenders.

42.     As a result of this fiduciary relationship, the DE Lenders owe HUD a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with HUD.   These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of HUD when endorsing loans for FHA insurance, reviewing the loans for quality control purposes, reporting defective loans, and submitting claims.

**B.     Lenders Must Submit Truthful Certifications.**

43.     The success of the DE Program depends upon proper underwriting of loan files.  Participating lenders determine the eligibility of borrowers and loans for FHA insurance, and ensure the integrity of the data relied upon to make such determinations.

44.     Under the DE Program, HUD relies on the expertise and knowledge of the lenders.

45.     Indeed, as noted below, HUD requires DE and LI Lenders to certify on an annual basis that they are fully aware of HUD requirements and will fully comply with them.

46.     HUD also relies on the truthfulness of the certification the lender completes on each loan certifying that the loan is eligible for FHA insurance.  As HUD has explained, these "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, thereby eliminating the necessity for a detailed HUD review of the loan

- 14 -

prior to endorsement." Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (March 22, 1983).

### C.   **Lenders Must Use Qualified Underwriters.**

47.   To obtain and maintain its status as a DE Lender, a lender must have qualified underwriters on staff.

48.   To qualify as a Direct Endorsement underwriter or "DE underwriter," an underwriter must satisfy several requirements. The DE underwriter "must have a minimum of three years full-time recent experience (or equivalent experience) reviewing both credit applications and property appraisals." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.3; *see also* HUD Handbook 4155.2 ch. 2.A.4.a. The underwriter must also be a "reliable and responsible professional skilled in mortgage evaluation" and "must be able to demonstrate his or her knowledge and experience regarding the principles of mortgage underwriting." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.1; *see also* HUD Handbook 4155.2 ch. 2.A.4.a.

49.   Lenders cannot offer underwriters improper incentives to approve loans. Specifically, "[e]mployees who perform underwriting and loan servicing activities may not receive commissions." HUD Handbook 4060.1, REV-2, ch. 2-9.A. Lenders are not allowed to provide bonuses based on the loans an underwriter approves.

50.   These requirements are intended to ensure that FHA-insured loans are underwritten only by qualified individuals who are knowledgeable and experienced

- 15 -

1    regarding FHA requirements, and that the decision to endorse the loan is based on the

2    eligibility of the mortgage rather than the financial interest of the underwriter.

3    **D.   <u>Lenders Must Perform Proper Due Diligence and Ensure Accuracy.</u>**

4    51.    A DE Lender is responsible for all aspects of the mortgage application, the

5    property analysis, and the underwriting of the mortgage.   That responsibility includes

6    performing due diligence and ensuring accuracy of underlying documentation, as it would

7    for the underwriting of any loan.

8    52.    Proper due diligence is a critical component of the DE Program and any

9    mortgage lending program.  It is required by federal regulation and HUD Handbooks.  It is

10   also required by virtue of the fiduciary duty and duty of reasonable care that the DE Lenders

11   owe to HUD.  *See* 48 Fed. Reg. at 11932 ("The duty of due diligence owed [HUD] by

12   approved mortgagees is based not only on these regulatory requirements, but also on civil

13   case law.").   The entire scheme of FHA mortgage guaranties presupposes an honest

14   mortgagee performing the initial credit investigation with due diligence and making the

15   initial judgment to lend in good faith after due consideration of the facts found.

16   53.    A lender's due diligence should (1) "determine a borrower's ability and

17   willingness to repay a mortgage debt, thus limiting the probability of default and collection

18   difficulties"; and (2) "examine a property offered as security for the loan to determine if it

19   provides sufficient collateral."   HUD Handbook 4155.1, REV-5, ch. 2-1.   Proper due

20   diligence thus requires an evaluation of, among other things, a borrower's credit history,

21   capacity to pay, cash to close, and collateral.  *Id.*

22

- 16 -

54.     In all cases, a DE Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment."  24 C.F.R § 203.5(c).

55.     HUD has established specific rules for due diligence predicated on sound underwriting principles.  In particular, HUD requires DE Lenders to be familiar and to fully comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed instructions and requirements for DE Lenders.  These requirements set forth the minimum standard of due diligence in underwriting mortgages with which DE Lenders must comply.

56.     HUD considers the DE underwriter to be "the focal point of the Direct Endorsement program."   HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C.  The DE underwriter must assume the following responsibilities:

> compliance with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;
>
> the review of appraisal reports, compliance inspections and credit analyses performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;
>
> the decisions relating to the acceptability of the appraisal, the inspections, the buyer['] s capacity to repay the mortgage and the overall acceptability of the mortgage loan for HUD insurance;
>
> the monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program; and

- 17 -

awareness of the warning signs that may indicate irregularities, and an ability to detect fraud, as well as the responsibility that underwriting decisions are performed with due diligence in a prudent manner.

*Id.*

57.     The DE underwriter must "evaluate the mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d).

58.     In addition, the mortgagee must "have the property appraised in accordance with [the] standards and requirements" prescribed by HUD.  *Id.* at § 203.5(e).  "The mortgagee's underwriter is to review the appraisal to determine whether or not the appraiser's conclusions are acceptable.  If found to be acceptable, the property is eligible for HUD mortgage insurance." HUD Handbook 4000.4, REV-1, CHG-2, ch. 3-3.G; *see also* HUD Handbook 4155.2, ch. 4.1.b (May 9, 2009).  Lenders are "responsible for properly reviewing appraisals and determining if the appraised value used to determine the mortgage amount is accurate and adequately supports the value conclusion."   HUD Handbook 4155.2, ch. 4.1.e.

59.     The underwriter's review includes verification, as possible, that the factual information submitted is correctly reported, as well as determination of the plausibility and consistency of the conclusions based on the data presented in the appraisal.  *See* HUD Handbook 4000.4, REV-1, CHG-2, ch. 3-3.G.  A DE Lender "must accept responsibility,

- 18 -

equally with the appraiser, for the integrity, accuracy, and thoroughness of the appraisal, and will be held accountable by HUD for the quality of the appraisal." Mortgagee Letter 1994-54.

60. The appraisal is important to the eligibility of the loan for FHA insurance because HUD places limits on the eligible loan amount based on the appraised value of the property. The maximum eligible loan amount is determined by HUD's loan-to-value ("LTV") limits, which compare the loan amount to the appraised value. This is one method by which HUD limits its exposure in the event of default.

61. When ensuring that a borrower is creditworthy, a DE Lender must comply with governing HUD requirements, such as those set forth in HUD Handbook 4155.1 (Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Unit Mortgage Loans). The rules set forth in HUD Handbook 4155.1 exist to ensure that a DE Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt. HUD has informed DE Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

62. DE Lenders can underwrite an FHA-insured loan in one of two ways. First, a DE underwriter can "manually underwrite" the loan, by making the credit decision whether to approve the borrower, in accordance with HUD underwriting rules. Second, the DE Lender can use a HUD-approved Automated Underwriting System ("AUS"), a software system that indicates the determination of a loan's eligibility for FHA insurance.

- 19 -

63.     To "manually underwrite" an FHA-insured loan, there are numerous steps the DE underwriter must take.  At a minimum, the underwriter must:

- obtain and review the borrower's credit history, including the borrower's payment history of housing obligations;

- obtain adequate explanations for major derogatory credit, including collections, judgments, and other recent credit problems;

- analyze the borrower's debt obligations;

- reject documentation transmitted by unknown or interested parties;

- inspect documents for proof of authenticity;

- verify the borrower's employment history;

- establish the borrower's income stability and make income projections;

- ensure that the borrower has invested a minimum required amount of his or her own funds in the transaction;

- document the source of funds invested in the transaction, including any gift funds;

- calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and

- consider and document any compensating factors permitting deviations from those fixed ratios.

*See* HUD Handbook 4155.1.

64.     Beginning in July 2008, HUD required DE Lenders to electronically process eligible loan requests through an AUS.  An AUS is a software system that connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders, or "TOTAL."  Using the data the lender inputs, HUD's "TOTAL" algorithm makes a credit determination and either: (i) provides an "Accept/Approve" decision, approving the loan

- 20 -

subject to certain conditions; or (ii) provides a "Refer" decision, referring the loan back to the lender for manual underwriting.  When TOTAL approves the loan, the approval is conditioned on the lender completing certain additional underwriting steps.  Many of these conditions relate to ensuring the data the lender entered is true, complete, and accurate.

65.    Numerous requirements promulgated by HUD explain how lenders must calculate each data point and what documentation they need to support each data point.

66.    For any loan approved through the use of an AUS, HUD requires the lender to certify to the integrity of the data it entered, which HUD defines as data that is true, complete, and accurate.  FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.  If the lender later receives or learns of information that materially differs from the information previously entered by the lender, the lender must re-submit a proposed loan to TOTAL through an AUS.

67.    The data entered into TOTAL is material to the endorsement of the loan because TOTAL is an algorithm that evaluates the overall creditworthiness of a mortgage applicant based on the data supplied by the lender.  Therefore, a loan receiving a TOTAL "Accept/Approve" decision is only eligible for FHA's insurance endorsement if "the data entered into the AUS [is] true, complete, properly documented, and accurate."  *See* FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.  It is the DE Lender's responsibility to ensure the integrity of the data relied upon by TOTAL.  *See* Mortgagee Letter 2004-1.

- 21 -

68.     Because TOTAL cannot analyze data that is not available to it, certain loans are not eligible for an AUS approval and must be manually underwritten.  "A manual downgrade becomes necessary if additional information, not considered in the AUS decision, affects the overall insurability or eligibility of a mortgage otherwise rated as an accept or approve."  FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.  While a lender is not required to have a DE underwriter review the credit portion of an AUS approved loan, a lender must have qualified staff review AUS approvals to ensure a loan that receives an "Accept/Approve" decision is in fact eligible for an AUS approval.  *See id.*

69.     To ensure the integrity of TOTAL's decision, as well as the integrity of the data TOTAL relies upon, lenders are prohibited from "manipulating . . . application variables [in] TOTAL mortgage scorecard to obtain an accept/approve risk classification."  *See* Mortgagee Letter 2005-15.

70.     If TOTAL does not approve a loan with an "Accept/Approve" decision, it returns a "Refer" decision, meaning the loan is referred back to the lender for manual underwriting.  Lenders must then have a DE underwriter perform a manual underwrite and determine if the loan is approvable under FHA's manual underwriting requirements.  *See* 24 C.F.R § 203.255(b)(5)(i)(B).

**E.   Lenders Must Have a Quality Control Program, Report Material Deficiencies, and Correct Identified Problems.**

71.     A DE Lender is required to maintain a quality control program to ensure the quality of its FHA-insured mortgages.  HUD requires that "[t]he Quality Control function must be independent of the [lender's] origination and servicing functions."   HUD Handbook 4060.1, REV-2, ch. 7-3.B; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.A.

72.     The quality control program must be designed to meet the goals of assuring compliance with FHA's requirements, protecting FHA from unacceptable risk, guarding against errors, omissions and fraud, and assuring swift and appropriate corrective action. HUD Handbook 4060.1, REV-2, ch. 7-2.

73.     To comply with HUD's quality control requirements, a DE Lender's quality control program must (among other things) conduct a full review of "all loans going into default [i.e., 60 days or more past due] within the first six payments," which HUD defines as "early payment defaults."  HUD Handbook 4060.1, REV-2, ch. 7-6.D; HUD Handbook 4700.2, REV-1, ch. 6-1.D.

74.     The quality control program also must review an appropriately sized sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines.  HUD Handbook 4060.1, REV-2, ch. 7-6.C; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.D.

75.     HUD prescribes how lenders must sample the loans.  The sample depends on the number of FHA loans the lender originates.  HUD Handbook 4060.1, REV-2, ch. 7-

- 23 -

6.C.  Under the HUD requirements, a "mortgagee who originates and/or underwrites more than 3,500 FHA loans per year may review 10% of its loans or a statistical random sampling that provides a 95% confidence level with 2% precision." *Id.*

76.    When a lender reviews a loan file for quality control, the lender must, among other things, review and confirm specific pieces of information.  For instance, "[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written reverification.  Examples of items that must be reverified include, but are not limited to, the mortgagor['s] employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds."  HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.; *see also* HUD Handbook 4700.2 REV-1, ch. 6-3.A.2.  "Each Direct Endorsement loan selected for a quality control review must be reviewed for compliance with HUD underwriting requirements, sufficiency of documentation and the soundness of underwriting judgments."  HUD Handbook 4060.1, REV-2, ch. 7-6.F.

77.    If the lender finds discrepancies, it must explore them to ensure that there are no deficiencies.  "Any discrepancies must be explored to ensure that the original documents . . . were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed."  HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.

78.    At the end of the quality control review, the lender is expected to assess the significance of any deficiencies.  The HUD Handbook recommends a "system of evaluating each Quality Control sample on the basis of the severity of the violations found

- 24 -

during the review.  The system should enable a mortgagee to compare one month['s] sample to previous samples so the mortgagee may conduct trend analysis."  HUD Handbook 4060.1, REV-2, ch. 7-4.

79.    HUD recommends four types of ratings.  The ratings provided for this purpose are:

"Low Risk", *i.e.,* no problems or minor problems were identified with loan servicing or origination;

"Acceptable Risk," *i.e.,* the issues identified were not material to the "creditworthiness, collateral security or insurability of the loan";

"Moderate Risk," *i.e.,* a failure to address significant unresolved questions or missing documentation has created moderate risk for the mortgagee and the FHA; and

"Material Risk," *i.e.* the issues identified were "material violations of FHA or mortgagee requirements and represent an unacceptable level of risk."

*Id.*

80.    Examples of "material risk" are violations that include a "significant miscalculation of the insurable mortgage amount or the applicant['s] capacity to repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud." HUD Handbook 4060.1, REV-2, ch. 7-4.D.

81.    These findings trigger mandatory reporting obligations.  Mortgagees "must report [Material Risk] loans, in writing," to HUD.  *Id.*

82.    A lender is also required to report to HUD "[f]indings of fraud or other serious violations" that are discovered "during the normal course of business and by quality control staff during review/audits of FHA loans."  HUD Handbook 4060.1, REV-2, ch. 7-3.J.  The

- 25 -

lender must report these findings, along with the supporting documentation, within 60 days of when the lender first discovers them.  *Id.*; *see also* HUD Handbook 4060.1, REV-2, ch. 2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices.").   Since November 2005, DE Lenders such as Guild have been required to make such reports through HUD's online Neighborhood Watch Early Warning System.  Mortgagee Letter 2005-26.

83.     Internal reporting of findings is also required.  Quality control review findings must "be reported to the mortgagee['s] senior management within one month of completion of the initial report."  HUD Handbook 4060.1, REV-2, ch. 7-3.I.

84.     In addition to appropriate reporting, lenders must act to address the problems they identify.   "Management must take prompt action to deal appropriately with any material findings.  The final report or an addendum must identify actions being taken, the timetable for their completion, and any planned follow-up activities."  *Id.; see also* HUD Handbook 4700.2, REV-1, ch. 6-1.F.

## F. FHA Requires Lenders to Certify Their Compliance With Their Programmatic Responsibilities.

85.     HUD requires DE Lenders to certify their compliance with the foregoing due diligence, quality control, and reporting requirements.

86.     First, when a lender applies to participate in the DE Program and to endorse loans for FHA insurance on HUD's behalf, the lender must certify that it will fully comply with all HUD guidelines, regulations, and requirements:

- 26 -

> I certify that, upon the submission of this application, and with its submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to, the National Housing Act (12 U.S.C. § 1702 *et seq.*) and HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies with regard to using and maintaining its FHA lender approval.

This certification is submitted to HUD headquarters in the District of Columbia.

87.    If the lender is approved, the lender must re-certify, every year, that it is complying with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan.  From 2007 to 2009, the lender was required to certify:

> I know or am in the position to know, whether the operations of the above-named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

This language was altered in 2010, requiring the lender to certify:

> I certify that I know, or am in the position to know, whether the operations of above-named lender conform to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies; and that I am authorized to execute this report on behalf of the lender.  I certify that the lender complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with [HUD].  I certify that to the best of my knowledge, the above-named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named lender is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for the above-named lender . . . .  Each of my certifications is true and accurate to the best of my knowledge and belief.  I understand that if I knowingly have made any

- 27 -

false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law. These certifications are submitted to HUD headquarters in the District of Columbia.

88.   Unless the lender submits a truthful initial certification and annual certifications, the lender is not entitled to obtain or maintain its status as a DE Lender or to endorse loans for FHA insurance.

89.   In addition, for each individual mortgage loan approved for FHA insurance, the lender must make a "loan-level" certification -- i.e., a certification specific to an individual loan -- that the individual mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A.

90.   The "loan-level" certification differs depending on whether the lender used an AUS or manual underwriting. For each loan that was underwritten with an AUS, the lender must certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id.* For each loan that required manual underwriting, the lender must certify that the DE underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage." *Id.*

91.   For all loans, the mortgagee's representative must certify: "I, the undersigned, as authorized representative of mortgagee at this time of closing of this mortgage loan,

certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents.  I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4."[1]  *Id.*  If the loan does not meet all applicable HUD requirements, it is not eligible for FHA insurance and cannot be certified for endorsement.

92.    Absent the applicable certifications for an individual loan as described in Paragraphs 89 to 91, the DE Lender cannot endorse that loan for FHA insurance.

93.    Each of the foregoing certifications is material to HUD's payment of any claim submitted under the DE Program.  Generally, for DE and LI Lenders, HUD does not review FHA loans for approval prior to the loan being endorsed for insurance or paying claims in the event of a default.  Instead, HUD relies on its lenders to comply with its requirements and to ensure that every loan is in fact eligible for FHA insurance.  The certifications are required for each lender to enter and remain in the program.  Accurate certifications (i) are critical to HUD's ability to ensure that only qualified and eligible loans are endorsed for HUD insurance; (ii) are essential for a claim on a loan to be eligible for FHA insurance; and (iii) are needed to protect HUD and the FHA insurance fund from undue risk and loss.

---

[1]    As of May 9, 2009, HUD Handbook 4000.4 was superseded by HUD Handbooks 4155.1 and 4155.2.

- 29 -

Case No. 16cv2909 (JAH/BLM)

### G.   Defaulted Loans Result in Losses to HUD.

94.   Once a loan is endorsed by HUD or the Direct Endorsement Lender, it is insured by FHA on the basis that the Direct Endorsement Lender has followed the HUD requirements and has submitted accurate certifications and that the loan is eligible for FHA insurance.  Without meeting those requirements, lender-endorsed loans are not eligible for FHA insurance.  It is only because a lender endorses a loan for FHA insurance that the holder of the mortgage is able to submit a claim to HUD for any losses.

95.   If the borrower defaults, the holder of the mortgage can submit a claim to HUD for any loss from the default.  The holder submits a claim for insurance by using HUD's electronic claim system.  The claim must include certain information, which is set forth on HUD form 27011 and electronic versions of the same.  Each loan that is endorsed for FHA insurance has a unique FHA case number, and the claim must include the FHA case number.  If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim.  The claim also must include the identification number of the mortgagee inputting the claim, which must be either the holder of record or the servicer of record of the mortgage.

96.   FHA pays these insurance claims in two parts.  First, the mortgage holder makes an initial claim for the unpaid principal on the loan, plus interest.  Second, if applicable, the mortgage holder later makes a final claim for expenses and allowances (e.g., foreclosure costs), plus interest.  HUD Handbook 4330.4, REV-1, ch. 2-4.

- 30 -

97.     These claims are submitted to HUD electronically, and HUD's electronic system processes them automatically. The system ensures that the FHA insurance is active with respect to the FHA case number provided and that there are no other impediments (such as a no-pay flag or indemnification agreement) to paying the claim.  After processing, the claim is approved for payment, and a disbursement request is sent to the United States Treasury to issue the funds through wire transfer to the holder of the mortgage note.

## II.     GUILD'S PARTICIPATION IN THE FHA PROGRAM.

98.     Guild began participating in the DE Program in January 1984 and in the Lender Insurance Program in June 2007.  During the Lending Time Period, Guild's underwriting primarily took place at Guild's headquarters or regional centers, although underwriting also occurred at certain branch offices.

### A.     Guild Directly Endorsed FHA Loans, Many of Which Have Defaulted, Requiring FHA to Pay Substantial Insurance Claims.

99.     After endorsing a loan for FHA insurance or causing it to be endorsed, Guild often sold the loan to large institutional investors located throughout the United States.

100.    Guild profited both by charging loan fees and by selling the FHA-insured loans.

101.    As of May 2016, HUD has paid claims on at least 1,691 mortgage loans endorsed by Guild during the Lending Time Period, paying almost $300 million dollars.

102.    Many additional claims are expected on loans endorsed for FHA insurance by Guild during the Lending Time Period.

- 31 -

**B.    Guild Certified That it Complied With HUD Requirements to Gain and Maintain Eligibility in the DE Program.**

103.    To become and remain a HUD-approved DE Lender, and to receive payment on claims for defaulted FHA-insured loans that it held, Guild was required to annually certify its compliance with HUD's requirements.

104.    For example, on March 22, 2010, Steven Hops, Vice President, certified to HUD for fiscal year ("FY") 2009 that:

> I know, or am in the position to know, whether the operations of [Guild] conform to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies[.] . . .
>
> I certify that to the best of my knowledge, [Guild] conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that [Guild] is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators and all other employees conducting FHA business for [Guild] in all of its offices where it performs any functions of an FHA-approved lender.

105.    Steven Hops made a similar certification for FY 2010.

106.    Mary Ann McGarry, Guild's President and Chief Executive Officer, made similar certifications for FY 2011.

107.    Guild made similar certifications for FY 2006, 2007, and 2008.

108.    The foregoing certifications in Paragraphs 89 to 91 and 104 to 105 were knowingly false because, as discussed below, Guild knew, deliberately ignored, or recklessly disregarded that it originated and underwrote loans that were not in compliance with HUD requirements.

**III.  GUILD CREATED UNDERWRITING PROCESSES AND PRACTICES THAT IT KNEW OR SHOULD HAVE KNOWN WOULD RESULT IN FALSE CLAIMS.**

109.  During the Lending Time Period, Guild underwrote loans when it knew, deliberately ignored, and recklessly disregarded, the fact that the loans did not comply with FHA requirements and knowingly and falsely certified to HUD that it (1) used due diligence in underwriting the loans; or (2) that the data it used to approve the loans for FHA insurance had integrity -- and that the loans were eligible for FHA mortgage insurance.

110.  As described below, Guild knew, deliberately ignored, and recklessly disregarded that many of its loans did not comply with FHA's underwriting requirements, and thus were not eligible for FHA mortgage insurance.

111.  Furthermore, Guild established certain underwriting processes that it knew, deliberately ignored, or recklessly disregarded would result in Guild endorsing materially defective loans for FHA mortgage insurance.

**A.    Guild Regularly Endorsed Loans for FHA Insurance that Did Not Meet FHA's Requirements.**

112.  As discussed in more detail in section IV below, although Guild's quality control process was grossly inadequate and violated FHA rules, through that process Guild nonetheless found that a significant portion of the loans it originated and underwrote during the Lending Time Period contained serious and material underwriting defects.

113.  During the Lending Time Period, Guild did not contemporaneously calculate defect rates or circulate defect rates to senior management.  However, in an August 2011 memo to the CEO of the company, Mary Ann McGarry, Dougherty suggested Guild set a

- 33 -

target defect rate of "the number of significant QC exceptions found divided by the number of loans reviewed."  In the memo, he provided his tabulations of Guild's historical defect rates:

Comparison of target defect rates to historical 2010 post-closing QC exceptions:

| Exception Type | Q2 | Q3 | Q4 | Avg. | Target | Q4 Diff. | Avg. Diff. |
|---|---|---|---|---|---|---|---|
| Underwriting | 32% | 33% | 26% | 30% | 15% | 11% | 15% |
| Compliance | 32% | 23% | 21% | 25% | 15% | 6% | 10% |

114.   The memorandum made clear that Guild's quality control staff regularly found that almost a third of the loans reviewed had significant underwriting errors.

115.   Guild began using a new outside Quality Control vendor in 2010, Quest Advisors.  Quest reported to Guild's quality control staff the percent of loans with an "elevated risk," *i.e.*, loans with a "significant" finding or multiple "moderate" findings. Prior to using Quest, Guild used an outside Quality Control vendor Adfitech, Inc.  Adfitech rated loans with five ratings.   The most serious findings were "serious findings," "fraud/misrep," and "guidelines not followed."   Quest instead rated findings as "significant" or "moderate."   Quest's "significant" findings most closely matched Adfitech's "serious" and "fraud/misrep" findings, while Quest's "moderate" findings most closely aligned with Adfitech's "guidelines not followed" finding -- both of which include violations of FHA requirements.

116.   In 2010 and 2011, Quest found and reported to Guild's quality control staff that nearly a third of the loans reviewed (29 percent) had an elevated risk.

- 34 -

117.    The quality control vendors did not calculate an FHA specific error rate. However, analyzing the specific findings reveals that Guild's quality control vendors found 21 percent of the FHA loans reviewed between 2006 and 2011 contained significant deficiencies.  Additionally, 51 percent contained significant or moderate deficiencies.

118.    Additionally, during the Lending Time Period, Guild conducted audits of branches that conducted underwriting.  These audits rated 40 percent of the branches (12 of 28) either Qualified or Unacceptable, the two worst possible ratings. Meanwhile, only four (4) branches received a "Superior" rating indicating minimal or no problems.

119.    The reviews by Guild's outside quality control vendors and Guild's audits of its branches that underwrote loans demonstrate that a significant portion of the loans Guild underwrote and endorsed for FHA insurance violated FHA requirements.

**B.      Guild Prioritized Aggressive Growth that Promoted Production Volume Over Loan Quality and Led to the Submission of False Claims to HUD.**

120.    In 2007, select members of Guild's senior management and a private equity firm, McCarthy Capital, engaged in a management buyout.  This buyout caused a dramatic shift in Guild's business plan whereby Guild aggressively grew from a small, regional lender, into an ever larger lender with a growing geographic footprint.  In order to grow quickly, Guild aggressively bought and merged with smaller lenders.  But, in its pursuit of growth, Guild ignored the poor quality of its underwriting.

121.    The number of Guild's FHA insured and non-FHA insured originations doubled in 2008 and again in 2009. Strikingly, while Guild's overall loan production was

- 35 -

doubling Guild's FHA insured originations grew exponentially between 2007 and 2008 – from 507 FHA mortgages in 2007 to 3,759 FHA mortgages in 2008.  That number nearly doubled again in 2009 when Guild originated and endorsed 8,382 FHA mortgages.

122.   This rapid growth caused the quality of underwriting to further deteriorate.  In April 2011, Cathy Blocker, Guild's Director of Operations, recognized the growth of the company was too much for the organization to handle and impacted the quality of HUD loans.  In explaining why she was working after 9:00 p.m., she stated "Because I am drowning . . . Between programming (or lack thereof), miscommunication, fear, the unknown, and the daily-changing rules/ideas/interpretations, the field is freaking out . . . I'm really worried that we are going to lose people over this . . . And for every hand I hold and every system glitch I investigate, there is one less repurchase request or HUD deficiency I can respond to.  Not to mention keeping me from being able to be proactive about system and process enhancements."

123.   Guild's principal means of growing so rapidly was through purchasing already established lending companies or branches. It was Guild's practice that branches did not perform underwriting and instead underwriting was centralized at Guild's corporate headquarters and regional underwriting centers.  Guild, however, granted exceptions to this practice for some branches, allowing them to keep underwriters on site.  Some of these excepted branches with underwriters on site were also Guild's largest originators.

124.   Guild aggressively recruited even small mortgage origination companies to serve as branches.  Guild regularly cited these smaller branches for continuing to market

- 36 -

themselves under their old, independent names rather than marketing themselves as Guild branches, even though these branches were often only loosely affiliated with Guild.

125.   Guild oversaw its field branches through a loan level quality control process, branch audits, local branch managers, and by reviewing Neighborhood Watch information. None of these methods proved effective to monitor its branches lending practices.  The following are representative examples of how Guild failed to properly oversee its branches and prioritized the quantity of loans originated over the quality of loans.

### 1.   Guild failed to properly oversee underwriting conducted by branches.

126.   One of Guild's first acquisitions was the Intermountain Mortgage Company (or "Montana branch") in early 2007.  Guild was aware of underwriting issues and problems communicating with the then-new Montana branch as early as March 2007. Guild audited the Montana branch soon after in May 2007.  This branch audit identified many issues with the Montana branch.  Nonetheless, it took Guild eight months to issue its audit report and provide its findings to the Montana branch.

127.   When the Montana branch finally responded to the audit report in February 2008, it noted problems associated with Guild's acquisition of it: "our becoming part of the Guild organization, was very akin to a 'shotgun wedding,' and we didn't have a lot of time to prepare, or to learn your systems or processes."  It also noted the issues in the audit "deal mostly with operational issues, operational issues can very often become compliance issues.  These issues have more to do with underwriting and general loan eligibility[.]"

More than a year after acquiring this branch, problems persisted regarding the completeness of its loan files.

128.   The Montana branch went on to make suggestions for improvements "because, we don't think Guild has a lot of experience in working with field underwriters. Given the growth curve Guild is on however, it is entirely possible that new branches or regions could be coming under the Guild umbrella that either have, or will have that kind of operational support and capabilities."

129.   As noted in the below examples, Guild failed to heed the Montana branch's advice, continued to grow exponentially, and let its underwriting quality suffer in pursuit of its growth.

### 2.   Guild's DTC branch demonstrated a lack of focus on quality.

130.   In May 2008, Guild acquired Liberty Financial Group and with it a branch in Denver known as Denver Tech Center (the "DTC branch").  The DTC branch was one of the branches that performed its own underwriting.

131.   The DTC branch was one of the highest producing branches during the Lending Time Period.  In fact, the Denver area was one of Guild's largest FHA market areas.  In 2012, the DTC branch issued over 3,000 home loans valued at over $566 million. Over 1,500 of these were government insured loans.  The DTC branch, however, also had one of Guild's highest default ratios.

132.   Through regular branch audits, Guild corporate management was aware of the problems at the DTC branch but, despite repeated audit findings, did not fix its problems.

- 38 -

133.   Guild first audited the DTC branch in July 2009 and provided the branch a "Qualified" rating.  The Qualified rating indicated a "[s]ignificant number of findings, and/or findings noted that have more serious impact or risk to Guild. Knowledge of procedures and controls; however, they appear to be inefficient."  The audit's findings included:

a.   "In three of the 10 (30%) loans reviewed, the auditor noted the Customer Identification Form (GMC #907) was signed by the loan officer certifying that they have personally viewed and accurately recorded the information from the borrower's identifying documents and have reasonably confirmed the identity of the applicant; however, the borrower's identity information was not completed on the form."   In essence, the auditors found the loan officers signed blank forms, potentially verifying false information they had not received or reviewed.

b.   "In all of the three loans (100%) which had an Address Discrepancy Notice ("ADN") on the credit report, the underwriter did not assign prior-to-fund condition #202 to address the ADN."  In essence, the underwriter ignored a red flag in the file that the borrower's address may be incorrect.

134.   Rather than fixing the identified problems, Guild allowed these problems to become worse.  When the DTC branch was audited again in May 2010, this time by an outside vendor Quest Advisors ("Quest"), the DTC branch was given an "Unacceptable" rating -- the worst rating possible.  An "Unacceptable" rating indicated "[s]erious concerns were noted: lack of knowledge, procedures, and/or controls in branch."

135.   Quest's findings of the DTC branch noted that the underwriters and other operations employees at the DTC branch were overseen by a manager in the sales department "which may cause a potential conflict of interest[.]"   That is, the sales department had a financial interest in approving loans and, therefore, could improperly pressure underwriters creating a conflict with the underwriter's job of ensuring the creditworthiness of the borrower and the acceptability of the loan's risk.

136.   The May 2010 audit also noted issues with DTC's recordkeeping systems: "The QA Auditor noted a lack of organization of files throughout the branch, and generally unsecured conditions for borrower's private data.  This violation is a branch-wide finding not specific to processing[.]"   The auditor went further to find that "most of the files designated for review by Guild corporate were unable to be located, as were many files during my spot check."

137.   At the conclusion of the May 2010 audit, Quest recommended a "return audit to check this branch for implementation of corrective action is recommended within 3 or 6 months[.]"  Guild, however, did not conduct the recommended follow-up audit.

138.   Guild did not even issue its internal report for Quest's May 2010 audit until January 2011, eight months later.  When Guild issued its report, it upgraded the DTC branch's rating from "Unacceptable" to "Qualified."   Guild's report repeated numerous findings from its prior 2009 audit report and in each case noted "there was an increase in the number of findings in 2010 as compared to last year's audit."   Guild's January 2011 internal audit report, however, did not identify the conflict of interest finding identified by

- 40 -

Quest.   Furthermore, despite Quest's findings, Guild did not attempt to review the underwriting at the DTC branch in issuing its internal report.

139.   In responding to the findings in Guild's January 2011 audit report, the DTC branch manager twice noted the problems arose because the branch prioritized production over compliance: "[o]ur staff or the LO [loan officer] would get busy and fall behind and monitoring the disclosures became disjointed," and "[t]he reason our procedure was ineffective was because once the branch got really busy, this procedure wasn't followed."

140.   Guild finally completed a follow up audit of the DTC branch in June 2012 – more than two years after Quest recommended.  The 2012 audit examined the underwriting performed by the DTC branch and found that the problems identified in Guild's prior reports.  Specifically, that Guild's June 2012 audit report noted: "On nine of the 17 (53%) loans tested, the auditor noted the underwriter had missed an issue that required a condition to be assigned to address the issue and approve the loan."  Loan conditions are a critical part of the underwriting process, ensuring that loans conform to requirements and regulations.

141.   In response, the branch noted that it was still prioritizing production over compliance.  That is, in responding to the underwriting findings noted in Guild's June 2012 report, the DTC branch recognized the "increased findings are due to high volume and not enough support in underwriting."

142.   The poor quality of the DTC branch was mirrored in the poor quality of the loans it originated, underwrote, and endorsed for FHA insurance.  The Guild's 2012 audit

- 41 -

report noted the DTC branch had a delinquency rate 15 percent higher than Guild's average delinquency rate.

143.   Additionally, that report noted the DTC branch had an FHA compare ratio -- which measures the number of defaults against an average lender -- of 190 percent, signifying that the FHA loans originated by the DTC branch defaulted 90 percent more often than an average FHA lender.

144.   Nonetheless, Guild still did not address the problems identified in its audits of the DTC branch.  Instead the problems festered until May 2013 when HUD notified Guild that HUD was considering terminating Guild's authority to originate FHA loans in Colorado due to extraordinarily high default rates.  Only in response to HUD's threat did Guild put in place loan quality safeguards at the DTC branch.

145.   One of these safeguards that Guild put in place as late as 2013 was to finally address the conflict of interest noted by Quest in 2009 by rearranging the reporting structure to avoid having a person responsible for underwriting report to someone responsible for generating more loans.  In June 2013, Kevin Dougherty noted during a call on the DTC branch's high FHA default rates that Guild "discovered that Kathy Previte, the Operations Manager, had been reporting directly to Sarah Middleton, a Sales Manager.  As such, all of underwriters for that office had been under extreme pressure to approve files to increase sales.  As of 5/1/13, Kathy Previte now reports to Cathy Blocker."  As this change highlights, Guild knowingly allowed underwriters to remain under extreme

- 42 -

pressure to approve FHA loans for endorsement in order to increase sales for as many as three years after Quest identified the conflict this caused.

### 3. Guild's indifference to quality underwriting was further reflected in its "Branch of the Year" awards.

146.   Guild's Eagle branch, located in Eagle, Idaho, was another problem branch for Guild.  The Eagle branch received "Qualified" ratings in both 2011 and 2012, because of a "[s]ignificant number of findings, and/or findings noted that have more serious impact or risk to Guild. Knowledge of procedures and controls; however, they appear to be inefficient." Guild's audits found that the Eagle branch failed to underwrite loans properly. The findings included that on 44 percent of the loans audited "the credit report indicated an Address Discrepancy Notification (ADN) and the underwriter did not assign a condition" and that on 22 percent of the loans audited "the underwriter had missed an issue that required a condition to be assigned to address the issue and approve the loan."

147.   Guild's senior management knowingly ignored correcting these problems that led to poor quality FHA loans because the Eagle branch was a profit center for Guild. Despite the repeated failed audits, Guild awarded the Eagle branch its "Branch of the Year" award in 2012.

148.   Senior management was not only aware of the qualified ratings but opted to reward the Eagle branch over the objections of Guild's Quality Assurance Director and head of Guild's quality control program, Lisa Klika.  Klika objected to rewarding the Eagle branch stating, "[i]t is difficult to support the recommendation in light of two years in a

- 43 -

row of qualified audit ratings," particularly given that, "[t]here are slight improvements in some areas of the 2012 audit as compared to 2011, but other areas that were worse or the same."

149.   In explaining the rationale behind rewarding this low quality branch and holding it out as a model for other branches, senior management explained that the Eagle branch was only second in originations behind the DTC branch, generating $358 million dollars in originations.

150.   Similarly, in 2010, only 3 of the 11 branches nominated for Branch of the Year were rated "Satisfactory."  In 2012, less than half of the branches nominated were rated "Satisfactory."  Guild made clear that it rewarded branches that could produce loans in higher quantity and tolerated the production of poor quality loans as long as production was high.

151.   Guild had a similar award for individual loan officers called the President's Club. As such, it similarly incentivized loan officers to churn loans with little regard for the underlying loan quality. President's Club members -- including branch managers -- were awarded trips to exotic locales such as Costa Rica in 2006 or Bora Bora in 2014.

**C.   Guild Created an Underwriting Process That Encouraged a Disregard for FHA Requirements and Led to the Submission of False Claims to HUD.**

152.   As discussed in Paragraphs 89 to 91 lenders must adhere to FHA underwriting requirements and certify to HUD that a mortgage endorsed for FHA insurance is eligible.

- 44 -

153.    Guild used electronic loan origination systems called i5, and later MyKey, as its underwriting compliance systems.  Those systems created underwriting conditions that Guild knew it had to satisfy before approving a loan.  In these systems, Guild used three types of conditions, auto-default conditions, standard conditions, and freeform conditions. Auto-default conditions focused on basic compliance, some specific to FHA requirements, such as obtaining an appraisal, ensuring the borrower signed the loan application, or receiving a flood certification.  Standard conditions included common conditions related to key areas of underwriting such as credit, employment, and assets.  Finally, freeform conditions were created by the underwriter when they encountered an underwriting requirement not covered by auto-default or standard conditions, such as obtaining a borrower's explanation for a deduction on a paystub. Conditions are an important check to ensure the underwriting is thorough and meets FHA standards.  An underwriter would clear a condition when it was met.

154.    At Guild, however, anyone involved in the loan could easily circumvent the condition's check because any standard or freeform condition could be waived.  Guild had no internal policy or guidance on who had authority to waive any particular condition.  And while Guild's loan origination system tracked whether a condition was cleared (satisfied) or waived (ignored), there were no requirements for management approval.

155.    Normally, the underwriter had to clear a condition, which indicated that the condition was met or satisfied as required.  An underwriter could, however, simply waive a condition to indicate that the requirement was no longer needed.  In many instances,

- 45 -

however, the waived condition was an FHA underwriting requirement that was in fact required for approval and endorsement.  In these instances, Guild actively and knowingly ignored FHA's requirements.

156.   Throughout the Lending Time Period, Guild allowed underwriters to waive conditions to underwriting requirements on loans that it endorsed for FHA insurance.  In creating and allowing the waiver of conditions, Guild knew, recklessly disregarded, or deliberately ignored that these loans were not eligible for FHA insurance and falsely certified that they were eligible for FHA insurance.

157.   Guild compounded these problems through the improper use of "junior underwriters."

158.   Guild's junior underwriters assisted DE underwriters but did not themselves have their DE certification.  Therefore, under FHA rules, junior underwriters could not manually underwrite an FHA loan.

159.   Nonetheless, Guild regularly tasked its junior underwriters with clearing conditions on manually underwritten loans -- a basic underwriting function requiring a DE underwriter.

160.   Indeed, Guild's job description for junior underwriters includes many underwriting functions such as "analyze / examine loan conditions" and "review asset docs, debts, credit reports to insure compliance with guidelines;" and Holly Melstrand, Guild's Assistant Vice President for National Underwriting, described the role of Guild's junior

- 46 -

underwriters as helping "with condition clearing and running AUS if there are minor changes."

161.   Guild's use of junior underwriters who did not have sufficient experience to manually underwrite loans led to the submission of numerous false claims.

162.   Additionally, Guild also improperly paid commissions to underwriters 2010, allowing them to earn a bonus based on the number of loans approved for FHA insurance and closed.  Under Guild's bonus program, underwriters did not receive a bonus if they underwrote a loan that was not ultimately approved.  As discussed in Paragraph 49, HUD prohibits this practice because it obviously provides incentives to underwriters to approve even loans that are ineligible for HUD insurance.

### D.   Examples of False Claims Made by Guild to HUD.

163.   Guild falsely certified that statements made in the application for insurance were true and accurate and that all conditions had been satisfied.  A number of its mortgages did not qualify for FHA insurance because they were not underwritten in accordance with HUD guidelines, Guild had not used due diligence in underwriting them, Guild entered data into its AUS that lacked integrity, and Guild failed to satisfy AUS conditions before closing and endorsing the mortgages for FHA insurance.  As a result of the foregoing conduct, Guild submitted or caused to be submitted numerous false claims to HUD for insurance on defaulted loans that were ineligible for such insurance.  The following are examples of those loans.

- 47 -

164.   FHA Case Number 048-4557472 relates to a property in the State of California.

    a.    Guild manually underwrote the mortgage for this property, approved and endorsed it for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, and that the loan complied with all HUD requirements and was eligible for FHA insurance. The mortgage closed on or about January 25, 2008.

    b.    Contrary to Guild's certifications, the DE underwriter did not use due diligence to underwrite the mortgage, and did not comply with HUD requirements in underwriting and approving this mortgage for FHA insurance.

    c.    HUD guidelines required Guild to determine the borrower's payment history of housing obligations for the previous twelve months. Accordingly, the underwriter placed a condition on the loan file requiring verification of rent.  However, Guild only verified the borrower's history of rent payments for the previous eight months. Melstrand, a Guild underwriter at the time, ultimately waived the condition.

    d.    Additionally, Guild overstated the income used to qualify the borrower for the loan. The borrower's most recent federal tax returns showed that

- 48 -

the borrower incurred unreimbursed business expenses. HUD requires the underwriter to deduct unreimbursed business expenses from a borrower's adjusted gross income.  Guild, however, did not deduct the expenses from the borrower's income even though Melstrand admitted in sworn testimony that the loan file lacked evidence that the borrower would no longer incur unreimbursed business expenses.

e.  Moreover, the borrower did not have a credit score and Guild failed to develop a sufficient credit history for the borrower. If a borrower does not have a credit score, HUD requires that the lender develop a credit history from alternative sources, such as utility payment records, automobile insurance payments, or rental payments. Although an underwriter placed a condition on the loan requiring that the borrower provide "two to three additional forms of credit," Melstrand ultimately waived the condition.

f.  Finally, Guild approved the loan with excessive qualifying ratios and failed to identify sufficient compensating factors, rendering the loan ineligible for FHA insurance.  An underwriter placed a condition on the loan stating "DTI is 51 percent and too high for manual approval."  The underwriter noted compensating factors of "housing expense is decreasing" and "not max financing," neither of which are compensating factors recognized by FHA.  Although FHA recognizes

- 49 -

as a compensating factor that "the borrower has successfully demonstrated the ability to pay housing expenses equal to or greater than the proposed monthly housing expense for the new mortgage over the past 12-24 months," Guild did not verify the borrower's history of rental payments for the previous 12-24 months.  Nonetheless, Guild ultimately waived the condition relating to the excessive ratios and approved the loan for FHA insurance.

g.    Melstrand assumed the borrower had at least $3,000 in current available cash when she underwrote the loan.  She therefore placed a condition for a verification of deposit for at least $3,000.  This condition was cleared by a junior underwriter.  The bank statement contained a large deposit of $2,500.  There is an explanation letter from the borrower in the file that the "cash deposit from the sale of furniture, tools, and some personal effects at a family yard sale."  FHA has particular guidelines for documentation to verify the sale of personal property.  The documentation in the file did not satisfy those guidelines as Melstrand admitted in sworn testimony. Melstrand further acknowledged that she did not review the insufficient documentation at the time Guild underwrote the loan as a junior underwriter cleared the condition in this regard.

h.  Indeed, Melstrand confirmed that the loan, and its corresponding loan file documentation, failed to comply with the FHA underwriting requirements for manually underwritten loans.

i.  The borrower only made two payments before defaulting.  Guild submitted a claim to HUD on or about December 8, 2009.  As a result, HUD paid a claim for $317,233.30.  The claim contained the FHA case number and the date of the mortgage's endorsement for FHA insurance but Guild failed to disclose that the loan did not qualify to be endorsed for FHA insurance and that FHA could contest the contract for insurance and not pay the claim, pursuant to 12 U.S.C. § 1709(e), because of Guild's fraud or misrepresentation in originating the loan.

165.  FHA Case Number 023-2531445 relates to a property in the State of Arizona.

a.  Guild manually underwrote the mortgage for this property, approved and endorsed it for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, and that the loan complied with all HUD requirements and was eligible for FHA insurance.  The mortgage closed on or about October 4, 2007.

b.  Contrary to Guild's certifications, Melstrand, who was a Guild underwriter at the time, did not use due diligence to underwrite the

- 51 -

mortgage, and did not comply with HUD requirements in underwriting and approving this mortgage for FHA insurance.

c. FHA rules required Guild to determine the borrower's payment history of housing obligations for the previous twelve months. Guild failed to obtain any documentation relating to the borrower's payment history of housing obligations. Nevertheless, Guild approved the mortgage loan for FHA insurance.

d. Additionally, the borrower received a gift that was used for the borrower's earnest money deposit. HUD guidelines required Guild to document the transfer of the gift funds. Accordingly, Guild placed a condition on the loan requiring "a legible copy of the donor's withdrawal slip, or cancelled check, along with the applicant's deposit slip or bank statement showing the deposit." Guild failed to properly document the gift.

e. Melstrand, who underwrote the loan, set each condition in the i5/MyKey system, including one for verification of the earnest money deposit.  It was a junior underwriter, however, who Melstrand allowed to clear each of the conditions. Melstrand did not review the work of the junior underwriter, but instead relied on the junior underwriter's determination that the conditions were properly cleared. The gift funds were only uncovered while verifying the earnest money deposit.

- 52 -

1    Therefore, the DE underwriter did not review any of the gift fund

2    documentation at the time of underwriting the loan, contrary to the DE

3    underwriter's certification that she had personally reviewed the

4    documentation.

5    f.    Subsequently, upon reviewing the loan file, Melstrand provided

6          testimony under oath that the gift fund documentation was inconsistent

7          with FHA guidelines.

8    g.    Moreover, Guild overstated the income used to qualify the borrower for

9          the loan. Guild used a monthly income amount to qualify the borrower

10         that included various types of pay other than base pay.  In addition to

11         the borrower's base pay, Guild included other types of pay such as "P-

12         straight time," "Misc. Other Pay," and "extra Board Guarantee" in the

13         income calculation. The paystubs obtained by Guild revealed that the

14         amount of such types of pay was inconsistent between pay periods.

15         Guild failed to show that the borrower had received these types of

16         income for the past two years, failed to document whether the income

17         was likely to continue, and failed to develop an earnings trend for the

18         income, in violation of HUD requirements.

19   h.    The borrower defaulted and a claim was submitted to HUD on or about

20         May 18, 2010.  As a result, HUD paid a claim for $242,573.58.  The

21         claim contained the FHA case number and the date of the mortgage's

22

- 53 -

1    endorsement for FHA insurance while failing to disclose that the loan

2    did not qualify to be endorsed for FHA insurance because Guild failed

3    to disclose that the loan did not qualify to be endorsed for FHA

4    insurance.

5    166.   FHA Case Number 121-2539701 relates to a property in the State of Idaho.

6         a.   Guild underwrote the mortgage for this property using an AUS,

7              approved and endorsed it for FHA insurance, and certified that the

8              information and data used to underwrite the loan had integrity and were

9              properly verified, that all of the AUS conditions had been satisfied, and

10             that the loan complied with all HUD requirements and was eligible for

11             FHA insurance.  The loan closed on or about January 2, 2009, and was

12             originated by the Guild's Eagle branch.

13        b.   Contrary to Guild's certifications, Guild did not comply with HUD

14             requirements in reviewing and approving this mortgage for FHA

15             insurance and did not ensure that the information it entered into the

16             AUS to obtain approval had integrity.

17        c.   Guild failed to sufficiently verify the borrower's employment. One of

18             the borrower's paystubs and a letter of explanation from the borrower

19             indicated that the borrower had recently been working part-time.

20             Nevertheless, the monthly income that Guild used to qualify the

21             borrower for the mortgage loan was based on full-time employment.

22

- 54 -

1    Guild failed to sufficiently verify that the borrower was indeed working

2    full-time.

3    d.    Moreover, Condition 29 of the AUS Certificate required Guild to verify

4    the borrower's employment history for the previous two years, and

5    Condition 28 required Guild to obtain an explanation of employment

6    gaps greater than six months that occurred in the previous two years.

7    The documentation obtained by Guild indicated that the borrower likely

8    had a gap in employment greater than six months in the previous two

9    years. Guild failed, however, to obtain a sufficient explanation from the

10    borrower regarding the gap in employment.

11    e.    Also, Condition 21 of the AUS certificate required Guild to include new

12    debts resulting from material inquiries listed on the credit report in the

13    monthly liabilities. Although the credit report revealed a recent inquiry

14    from GEMB/WALMART, there is no evidence in the loan file that

15    Guild determined whether the inquiry resulted in new debts.

16    f.    Lastly, Guild qualified the borrower using $5,000 in assets held in a

17    checking account that the borrower purportedly received from the sale

18    of another residence.  Condition 31 of the AUS Certificate required

19    Guild to verify the depository assets, and Condition 32 of the AUS

20    Certificate required Guild to document the sale of the property, and

21    include the net equity in a liquid asset account.   Guild did not

22

sufficiently verify and document the funds received from the sale of the residence, and thus did not sufficiently verify and document the source of the funds in the checking account on which Guild relied to qualify the borrower.

g.   The borrower defaulted and Guild filed a claim on or about July 19, 2012.  As a result, HUD paid a claim for $79,306.70.  The claim contained the FHA case number and the date of the mortgage's endorsement for FHA insurance but Guild failed to disclose that the loan did not qualify to be endorsed for FHA insurance and that FHA could contest the contract for insurance and not pay the claim, pursuant to 12 U.S.C. § 1709(e), because of Guild's fraud or misrepresentation in originating the loan.

167.  FHA Case Number 052-6113902 relates to a property in the State of Colorado.

a.   Guild underwrote the mortgage for this property using an AUS, approved and endorsed it for FHA insurance, and certified that the information and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had been satisfied, and that the loan complied with all HUD requirements and was eligible for FHA insurance. The loan closed on or about October 27, 2010 and was originated by Guild's DTC branch.

b.  Contrary to Guild's certifications, Guild did not comply with HUD requirements in reviewing and approving this mortgage for FHA insurance and did not ensure that the information it entered into the AUS to obtain approval had integrity.

c.  Condition 6 of the AUS Certificate stated that the minimum statutory investment requirement for the mortgage loan was $6,188. However the borrower's investment was far less, approximately $2,800. Nevertheless, Guild approved the mortgage loan for FHA insurance.

d.  The borrower only made two payments before defaulting. A claim was submitted on or about October 19, 2013. As a result, HUD paid a claim of $180,531.94. The claim contained the FHA case number and the date of the mortgage's endorsement for FHA insurance while failing to disclose that the loan did not qualify to be endorsed for FHA insurance because Guild failed to disclose that the loan did not qualify to be endorsed for FHA insurance.

168.  FHA Case Number 048-5287960 relates to a property in the State of California.

a.  Guild underwrote the mortgage for this property using an AUS, approved and endorsed it for FHA insurance, and certified that the information and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had been satisfied, and

- 57 -

that the loan complied with all HUD requirements and was eligible for FHA insurance.  The loan closed on or about May 22, 2009.

b.      Contrary to Guild's certifications, Guild did not comply with HUD requirements in reviewing and approving this mortgage for FHA insurance and did not ensure that the information it entered into the AUS to obtain approval had integrity.

c.      The borrower was required to bring approximately $16,200 to closing. Condition 33 of the AUS Certificate required Guild to verify the depository assets input into AUS. The assets consisted of the borrower's checking account and a gift.  Condition 34 of the AUS Certificate required Guild to verify the source of the earnest money deposit or any large deposits that exceeded 2 percent of the sales price, or appeared excessive based on the borrower's history of accumulating savings.  Condition 32 of the AUS Certificate required Guild to obtain a copy of the transfer of the gift funds and confirm that those funds came from an acceptable source.  Guild failed to verify the depository assets, because the borrower's checking account contained large deposits that Guild failed to source, and because Guild failed to obtain a withdrawal document showing that the gift came from the gift donor's account.  Thus, Guild did not properly verify that the borrower had

- 58 -

1    sufficient funds to close the mortgage loan or that the information input

2    into AUS was accurate.

3    d.    Guild knew that it did not properly verify that the borrower had

4    sufficient funds to close the loan. Guild placed a condition on the loan

5    noting, among other things: "sufficient cash to close/satis source of

6    same," "Need to document additional funds," and "There is a deposit

7    of $2,960 on 5/14. Need to document the source of this." Guild failed,

8    however, to obtain such documentation, and a notation in the loan file

9    indicates that the condition was waived. Nevertheless, Guild approved

10    the mortgage for FHA insurance.

11    e.    The borrower made only two payments before defaulting. Guild

12    submitted a claim to HUD on or about May 17, 2013. As a result, HUD

13    paid a claim for $45,007.79. The claim contained the FHA case number

14    and the date of the mortgage's endorsement for FHA insurance but

15    Guild failed to disclose that the loan did not qualify to be endorsed for

16    FHA insurance and that FHA could contest the contract for insurance

17    and not pay the claim, pursuant to 12 U.S.C. § 1709(e), because of

18    Guild's fraud or misrepresentation in originating the loan.

19    169.   FHA Case Number 023-2731663 relates to a property in the State of Arizona.

20    a.    Guild underwrote the mortgage for this property using AUS, approved

21    and endorsed it for FHA insurance, and certified that the information

22

- 59 -

and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had been satisfied, and that the loan complied with all HUD requirements and was eligible for FHA insurance.  The loan was a refinance that provided cash back to the borrower ("a cash-out refinance"), and closed on or about April 30, 2008.

b.  Contrary to Guild's certifications, Guild did not comply with HUD requirements in reviewing and approving this mortgage for FHA insurance and did not ensure that the information it entered into AUS to obtain approval had integrity.

c.  Guild did not comply with the AUS conditions for approval of the loan. Condition 16 of the AUS certificate required that if a debt or obligation was revealed during the loan application process and was not considered by the AUS, that the underwriter verify the actual monthly payment amount and resubmit the loan with the liability if it is greater than $100 per month.  The credit report revealed a monthly liability to the Arizona Federal Credit Union in the amount of $639 per month, and the liability was not paid off at closing.  Guild did not, however, include the obligation in the AUS calculation of monthly liabilities.

d.  Moreover, Condition 14 of the AUS certificate required Guild to include new debts resulting from material inquiries listed on the credit

- 60 -

report in the monthly liabilities. Although the credit report revealed recent inquiries from the Desert School Federal Credit Union and the Arizona Federal Credit Union, there is no evidence in the loan file that Guild determined whether such inquiries resulted in new debts.

e.     The borrower defaulted and a claim was filed on or about May 12, 2011. As a result, HUD paid a claim of $184,158.03.  The claim contained the FHA case number and the date of the mortgage's endorsement for FHA insurance while failing to disclose that the loan did not qualify to be endorsed for FHA insurance because Guild failed to disclose that the loan did not qualify to be endorsed for FHA insurance.

170.   FHA Case Number 121-2644486 relates to a property in the State of Idaho.

a.     Guild underwrote the mortgage for this property using an AUS, approved and endorsed it for FHA insurance, and certified that the information and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had been satisfied, and that the loan complied with all HUD requirements and was eligible for FHA insurance. The loan closed on or about May 29, 2009.

b.     Contrary to Guild's certifications, Guild did not comply with HUD requirements in reviewing and approving this mortgage for FHA insurance and did not ensure that the information it entered into AUS to obtain approval had integrity.

- 61 -

c.    In obtaining AUS approval for the loan, Guild overstated the income used to qualify the borrower for the loan. Guild used a monthly income of $3,000 for the borrower. However, the borrower's paystub supported a monthly income of no more than $2,708.33. Nevertheless, Guild approved the loan based on an overstated monthly income.

d.    Moreover, in obtaining AUS approval for the loan, Guild understated the borrower's monthly liabilities. Although the credit report and other associated documentation revealed monthly liabilities in the amount of $779, Guild approved the loan using monthly liabilities in the amount of $727.

e.    The borrower defaulted and Guild submitted a claim on or about April 1, 2013.  As a result, HUD paid a claim of $132,117.94.  The claim contained the FHA case number and the date of the mortgage's endorsement for FHA insurance but Guild failed to disclose that the loan did not qualify to be endorsed for FHA insurance and that FHA could contest the contract for insurance and not pay the claim, pursuant to 12 U.S.C. § 1709(e), because of Guild's fraud or misrepresentation in originating the loan.

171.  FHA Case Number 197-3886522 relates to a property in the State of California.

a.  Guild manually underwrote the mortgage for this property, approved and endorsed it for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, and that the loan complied with all HUD requirements and was eligible for FHA insurance. The mortgage closed on or about October 17, 2008.

b.  Contrary to Guild's certifications, Guild did not use due diligence to underwrite the loan, and did not comply with HUD requirements in underwriting and approving this mortgage for FHA insurance.

c.  HUD requires all court-ordered judgments to be satisfied before a mortgage loan is eligible for FHA insurance.  Nevertheless, Guild approved the mortgage for FHA insurance despite the fact that the borrower's credit report revealed an unpaid court-ordered judgment.

d.  Moreover, Guild failed to properly ascertain that gift funds provided to the borrower came from an acceptable source. The documentation relating to the gift revealed that the gift donor's bank account had a balance of $193.52.  The gift donor made a cash deposit of $3,205 into the account five minutes prior to withdrawing the gift amount of $3,200.  Nevertheless, Guild approved the mortgage for FHA insurance without determining that the gift funds came from an acceptable source, in violation of HUD requirements.

- 63 -

e.   HUD requirements also provide that overtime income may be used to qualify a borrower if such income has been received for the previous two years and it is likely to continue. In order to rely on overtime income, the lender must develop an average of overtime income for the past two years, and establish and document an earnings trend. If there has been a continual decline in overtime income, the lender must provide a sound rationalization in writing for including the income to qualify the borrower. Guild relied on overtime income in qualifying the borrower, but failed to develop an average of overtime income for the past two years, and failed to establish and document an earnings trend for the overtime income.

f.   The borrower defaulted and Guild submitted a claim on or about April 12, 2011. As a result, HUD paid a claim of $295,952.04. The claim contained the FHA case number and the date of the mortgage's endorsement for FHA insurance but Guild failed to disclose that the loan did not qualify to be endorsed for FHA insurance and that FHA could contest the contract for insurance and not pay the claim, pursuant to 12 U.S.C. § 1709(e), because of Guild's fraud or misrepresentation in originating the loan.

172.   FHA Case Number 043-7445748 relates to a property in the State of California.

- 64 -

a.   Guild manually underwrote the mortgage for this property, approved and endorsed it for FHA insurance, and certified that the underwriter had personally reviewed the associated documentation, used due diligence to underwrite the mortgage, and that the loan complied with all HUD requirements and was eligible for FHA insurance. The mortgage closed on or about December 26, 2007.

b.   Contrary to Guild's certifications, the DE underwriter did not use due diligence to underwrite the mortgage, and did not comply with HUD requirements in underwriting and approving the mortgage for FHA insurance.

c.   Guild was required to determine the borrower's payment history of housing obligations for the previous twelve months. Guild failed to document the borrower's payment history of housing obligations for the most recent seven months. Nevertheless, Guild approved the mortgage loan for FHA insurance.

d.   The borrower defaulted and a claim was filed with HUD on our around December 30, 2010.  As a result, HUD paid a claim of $399,182.63. The claim contained the FHA case number and the date of the mortgage's endorsement for FHA insurance while failing to disclose that the loan did not qualify to be endorsed for FHA insurance because

- 65 -

Guild failed to disclose that the loan did not qualify to be endorsed for FHA insurance.

173.   At bottom, in each of these examples, Guild violated HUD requirements and falsely certified to compliance with those requirements.  Guild was therefore not authorized to endorse these mortgage loans for FHA insurance.   Guild's false certifications and violations of HUD requirements bore upon the likelihood of whether the borrower would make mortgage payments.

**E.    Guild's Wrongful Conduct Violated Specific HUD Rules and Requirements Governing the Origination and Underwriting of FHA <u>Insured Mortgages.</u>**

174.   Guild's knowingly improper origination and underwriting of FHA mortgage loans violated numerous specific rules and requirements published by HUD.

175.   Specifically, Guild violated requirements contained or referenced in one or more of the following documents, which set forth the minimum standards for originating and underwriting FHA insured mortgages and with which HUD regulations required Guild to comply, *see* 24 C.F.R. §§ 203.5(c), (d), (e); 203.255(b)(5):

    a.    HUD Handbook 4155.1 Revision 5 ("REV-5"), *Mortgage Credit Analysis for Mortgage Insurance*, dated October 2003 and Mortgage Letters amending and clarifying the same;

    b.    HUD Handbook 4155.1, *Mortgage Credit Analysis for Mortgage Insurance*, issued May 2009 and Mortgagee Letters amending and clarifying the same; and

    c.    *FHA Total Mortgage Scorecard User Guide* dated December 2004;

- 66 -

d.   HUD Handbook 4000.4 REV-1, Change 2, *Single Family Direct Endorsement Program*, issued July 1994 and Mortgagee Letters amending and clarifying the same;

e.   HUD Handbook 4060.1 REV-2, *FHA Title II Mortgage Approval Handbook*, issued August 2006 and Mortgagee Letters amending and clarifying the same;

f.   HUD Handbook 4000.2 REV-3, *FHA Mortgagees' Handbook Application Through Insurance*, issued May 2004 and Mortgagee Letters amending and clarifying the same;

g.   HUD Handbook 4155.2, *Lender's Guide to Single Family Mortgage Insurance Processing*, issued May 2009 and Mortgagee Letters amending and clarifying the same (including, but not limited to, Mortgagee Letter 2009-28);

h.   HUD Handbook 4165.1 REV-2, *Endorsement for Insurance for Home Mortgage Programs (Single Family)*, issued April 2005 and Mortgagee Letters amending and clarifying the same;

i.   HUD Handbook 4150.1 REV-1, *Valuation Analysis for Home Mortgage Insurance*, issued February 1990 and Mortgagee Letters amending and clarifying the same (including, but not limited to, Mortgagee Letters 1994-54 and 1996-26); and

j.   HUD Handbook 4150.2 Change 1, *Valuation Analysis for Single Family One- to Four-Unit Dwellings*, issued July 1999 and Mortgagee Letters amending and clarifying the same.

176.   Guild's violations of these authorities as to specific loans rendered Guild's certifications on the loans' HUD Forms 92900-A false.  HUD Form 92900-A, *HUD/VA Addendum to Uniform Residential Loan Application*, dated June 2005 and revisions of the same; s*ee, e.g.* 24 C.F.R. § 203.255(b)(5).  These falsities were material to and rendered false the ultimate submission of mortgage insurance claims on the loans, including because the claims were made on mortgage insurance that was fraudulently induced and because such claims contained misleading half-truths.  Specifically:

- 67 -

a.    That is, by certifying a loan's compliance with the above authorities at the time of endorsement (when the loan did not so comply), Guild falsely and fraudulently induced HUD to insure the loan (rendering any insurance claim on that loan false).

b.    Further, a claim presented by Guild on HUD Form 27011 or its electronic counterpart for a loan that Guild falsely endorsed for FHA mortgage insurance gave an FHA case number and the date of the loan's endorsement for FHA insurance while failing to disclose that the loan did not qualify to be endorsed for FHA insurance pursuant to the above authorities and that FHA could contest the contract for insurance and not pay the claim, pursuant to 12 U.S.C. § 1709(e), because of Guild's fraud or misrepresentation in originating the loan.

c.    Lastly, a claim presented by a subsequent holder of a loan on HUD Form 27011 or its electronic counterpart that Guild falsely endorsed for FHA mortgage insurance gave an FHA case number and the date of the loan's endorsement for FHA insurance while failing to disclose that the loan did not qualify to be endorsed for FHA insurance pursuant to the above authorities because Guild failed to disclose that the loan did not qualify for FHA insurance.

- 68 -

## IV. GUILD'S QUALITY CONTROL PROCESS WAS GROSSLY INADEQUATE AND FURTHER EVIDENCES GUILD'S RECKLESS DISREGARD OF FHA REQUIREMENTS.

177.   FHA mandates that lenders maintain a diligent quality control program with specific requirements to monitor for underwriting defects and other violations of FHA lending, underwriting, and insurance requirements.  Guild knowingly failed to adhere to these obligations, resulting in Guild burying its head in the proverbial sand by recklessly continuing its unlawful origination and underwriting practices.

178.   Indeed, between 2006 and 2011 Guild's quality control processes were often completely ignored, ineffective, and insufficient to monitor and correct the major failings in Guild's origination and underwriting.

179.   Guild failed to internally review quality control findings during a number of quarters between 2006 and 2009.

180.   When Guild did actually review quality control findings, the review was routinely done half a year or more after the loans were closed, allowing problems with poor quality underwriting to fester with no identification or feedback.

181.   Furthermore, Guild neither calculated nor tracked an overall defect rate for the loans it reviewed, and was therefore unable to fully comprehend the poor loan quality of the HUD loans it originated and underwrote.

182.   Finally, Guild failed to report to HUD serious violations of HUD regulations as required.

- 69 -

A. **Guild's Quality Control Process Failed to Comply With Required Timelines.**

183.   During the Lending Time Period, Guild outsourced the initial quality control reviews of its loan origination and underwriting to an outside quality control vendor.  Until 2009, Guild used Adfitech as its quality control vendor.   In 2009, Guild terminated Adfitech and subsequently contracted with Quest as its outside quality control vendor.

184.   Typically, Guild would select loans to review for underwriting quality one month after the loan closed and was endorsed for FHA insurance -- *e.g.,* loans closed between January 1st and January 31st would be selected in February for review. Those loan files selected for review would then be sent to the outside vendor for the initial review. After the vendor reviewed the files, the vendor would provide the results of the review to Guild through both a written management summary document as well as in a Microsoft Excel spreadsheet. Guild Quality Assurance staff were supposed to review those findings, send information to managers for response if it was deemed necessary, and ultimately summarize the findings into quarterly post-closing analysis memoranda that would be distributed and discussed at bi-monthly Audit Committee meetings.

185.   HUD required Guild to "ensure that quality control reviews [were] performed on a regular and timely basis."  HUD Handbook 4060.1, REV-2, ch. 7-3.D.  Each selected loan was to be subject to a quality control review within 90 days from the end of the month in which the loan closed. *Id.* at ch. 7-6.A. HUD required Guild to conduct quality control reviews, at minimum, monthly.  *Id.* at ch. 7-6.B.  HUD required that review findings be

- 70 -

1    reported to senior management within one month of completion of the initial report. *Id.* at

2    ch. 7-3I.

3        186.   Despite this requirement, Guild was routinely reviewing loans on a quarterly

4    basis months past the 90 day required window.  Indeed, Guild's head of quality control

5    confirmed that only Guild's quality control vendor's initial findings were completed within

6    90 days, and that Guild's own review occurred after that period when it reviewed the

7    findings, circulated any findings to the responsible party, and wrote up a summary for

8    management.

9        187.   Indeed, Guild's quality control process was often delinquent and at times not

10    completed at all.  Between January 2006 and December 2011, it was always between seven

11    and eleven months after the first loans were underwritten in a quarter before the loan was

12    formally included in a post-closing quality control analysis memorandum -- far exceeding

13    the required turnaround time.  In 2008, Guild's quality control review was commonly 9 to

14    11 months after loan funding.  In 2010 and 2011 loans were commonly reviewed 7 to 8

15    months after loan funding.  By neglecting to meet this requirement, Guild lacked the

16    capability to respond quickly to trends and issues that were identified in the quality control

17    process.

18

19

20

21

22

- 71 -

188.   The chart below summarizes Guild's quality control reporting:

| Quarter | Dates of Loans Underwritten in Sample | Date of QC Review Memo | Months Between First Loan in Sample and QC Memo |
|---|---|---|---|
| 1Q06 | January to March 2006 | December 4, 2006 | 11 months |
| 2Q06 | April to June 2006 | None | Not formally completed |
| 3Q06 | July to September 2006 | None | Not formally completed |
| 4Q06 | October to December 2006 | July 13, 2007 | 9 months |
| 1Q07 | January to March 2007 | December 12, 2007 | 11 months |
| 2Q07 | April to June 2007 | None | Not formally completed |
| 3Q07 | July to September 2007 | None | Not formally completed |
| 4Q07 | October to December 2007 | None | Not formally completed |
| 1Q08 | January to March 2008 | October 20, 2008 | 9 months |
| 2Q08 | April to June 2008 | March 27, 2009 | 10 months |
| 3Q08 | July to September 2008 | Draft April 8, 2009 (no final version) | 9 months |
| 4Q08 | October to December 2008 | None | Not formally completed |
| 1Q09 | January to March 2009 | October 9, 2009 | 9 months |

- 72 -

| Quarter | Dates of Loans Underwritten in Sample | Date of QC Review Memo | Months Between First Loan in Sample and QC Memo |
|---------|---------------------------------------|------------------------|-------------------------------------------------|
| 2Q09 | April to June 2009 | None | Not formally completed |
| 3Q09 | July to September 2009 | None | Not formally completed |
| 4Q09 | October to December 2009 | None | Not formally completed |

189.   The delays in Guild's quality control process continued into 2011.  In July 2011, the head of operations, Cathy Blocker, inquired of Relator Kevin Dougherty, Guild's Quality Assurance Manager, if he had underwriters' responses to the March findings.  He responded that "those have not gone out yet and probably won't for some time.  Karen's job entails reviewing all Quest items and sending response requests, but she's been so busy fulfilling Fannie Mae's investor requests (387 YTD) she is behind schedule on Quest reviews.  She has sent out the January requests and is currently half way through February reviews."  Despite FHA's timing requirements for management to receive feedback after closing a loan, the underwriters had not even received the findings until five months after the loan closed.

190.   Guild regularly was late in providing files to the quality control vendor to review.  For example, FHA loan 045-6546869 was closed on June 3, 2008 but was not received by Adfitech until September 18, 2008, 107 days later.  To meet FHA's requirements, Guild's review of Adfitech's findings should have been completed by

- 73 -

September 1, 2008, over two weeks before the Adfitech even received the file to review. Adfitech found that Guild violated FHA requirements in underwriting the loan as Guild failed to properly document gift funds.   Moreover, according to Guild's internal procedures, this loan should have been included in its 3rd Quarter 2008 post-closing quality control analysis memorandum.   Not only did the review of this loan not start even until after the final report should have been issued, the review was never completed.

191.   As an additional example, FHA case number 197-3957398 closed on December 29, 2008.   The entire quality control review should have been completed by March 31, 2009.   Nonetheless, Adfitech did not receive the loan file to begin the review until March 23, 2009, and did not complete its review until May 21, 2009. Adfitech found that "an explanation and documentation of the source of the $3,000 deposit into the Borrower's account was not in the file."   As per Guild's internal procedures, if there had been a formalized post-closing quality control analysis it should have been included in the 2nd Quarter 2009 post-closing quality control analysis memorandum; but, no formalized written memo was completed for that quarter.

192.   Guild's management knew that its delays in its quality control program were problematic.  For example, in October 2009, Klika noted that Guild had received regulatory reprimands for timeliness issues, "One of their findings last year was that the timeliness of our QC was below par and needed improvement.   I am concerned about a repeat finding this year."

193.   Nonetheless, as noted above, the delays in Guild's quality control program continued throughout the Lending Time Period.

**B.  Guild's Own Internal Branch Audits Revealed Patterns of Practice That Were Not in Compliance With FHA Regulations.**

194.   Periodic branch audits are required by HUD.   Branch audits serve an important role in corporate oversight of branches – offering corporate headquarters an opportunity to glimpse any red flags in meeting FHA loan origination requirements developing nationwide at the local branch level.

195.   Common issues mandated as part of the review include: that offices are properly registered with FHA, that operations are conducted in a professional, business-like environment; that the office is sufficiently staffed with trained personnel, and that office personnel have access to relevant statues, regulations, and HUD issuances and Handbooks.

196.   Guild's branch audits were completed primarily by its in-house quality control and internal audit department staff.   Occasionally Guild outsourced this task to a third party quality control vendor, Quest.   Either internal or third party auditors review numerous branch requirements and summarize their findings into a final report for senior management.

197.   Guild Branch Audits resulted in one of four ratings.   Ratings were determined based upon the percentage or number of exceptions in each area audited.   Audit areas

- 75 -

included a review of the office space, canceled/denied loans, loans in delinquency/foreclosure, in-process loans, and underwriting, including FHA loans.

198. The four ratings are as follows:

i. *Superior* -- Very minimal to no findings in each area audited. Procedures and controls are in place.

ii. *Satisfactory* -- Findings noted during audit; however, they appear to have minimal risk to Guild. Procedures and controls appear in place.

iii. *Qualified* -- Significant number of findings, and/or findings noted that have more serious impact or risk to Guild. Knowledge of procedures and controls; however, they appear to be inefficient.

iv. *Unacceptable* -- Serious concerns were noted: lack of knowledge, procedures, and/or controls in branch.

199. Despite repeatedly and consistently finding problems that had a serious impact or risk to Guild, Guild did not follow-up or address these findings with the frequency required. Branches with a sudden increase in volume, high early payment default rates, or past problems were not audited on an annual basis, as required.

200. Guild conducted 127 branch audits during the Lending Time Period. Almost 40 percent (50 out of 127) received one of the two lowest ratings, Qualified or Unacceptable.

201. For example, the problematic DTC branch (*see* Paragraphs 130 to 145 above) had three of the trigger criteria listed in the HUD Handbook escalating the requirement to yearly audits: a history of past problems, a high early payment default rate, and dramatically increasing volume. The DTC should have been audited annually, totaling seven times during the years 2006 through 2013, yet was only audited four times. As

- 76 -

discussed above, the 2010 Quest auditors even recommended another audit in less than one year due to the severity of the problems– at a frequency more prudent than required by HUD. Guild did not complete an audit as recommended by its own auditor, Quest, within 6 months and did not complete the mandated audit a year later.

202.   Most branches did not conduct underwriting but instead only originated the loan and sent the file to one of Guild's central underwriting centers.  That said, twenty branches that were audited were exceptions to this policy and had underwriting on site. Consistent with the overall branch audits, over 40 percent (12 of 28) were rated either Qualified or Unacceptable. Meanwhile, only 4 branches received a "Superior" rating indicating minimal or no problems, and all four of those were prior to the change in Guild's ownership that occurred in 2007.

203.   Even when a branch was rated Satisfactory, the audit revealed serious concerns with the underwriting at Guild.  For example, the California Wholesale branch received a "Satisfactory" rating in 2010. As part of the underwriting review it was noted that "on seven of the 10 (70 percent) loans reviewed, underwriting conditions were not assigned where they should have been to address issues or questions in the file."  The underwriting was simply incomplete on almost three quarters of the loans reviewed in this audit.

### C.  Guild Failed to Determine Its Defect Rate During the Lending Time Period.

204.  Guild did not calculate a defect rate until October 2012, after all the loans at issue in this complaint were originated, underwritten, and endorsed for FHA insurance. Guild instead reported trends, which were a number of loans that had the same particular type of deficiency.  These trends were determined at the discretion of Guild's quality control leadership and were not formally tracked or compared from quarter to quarter.

205.  Klika, Guild's Quality Assurance Director, claimed that Guild was calculating a defect rate. However, when asked under oath in sworn testimony what defect rate was being calculated, Klika was only able to state that, "well, it would vary."  She was unable to define a definition for the defect rate, explaining, "there was no definition of a defect rate.  That was part of the problem."

206.  In 2011, Dougherty, Guild's Quality Assurance Manager, repeatedly stressed the need for and importance of adducing a defect rate.  As discussed in Paragraph 113, in an August 2011 memo to the CEO of the company, McGarry, Dougherty suggested Guild set a target defect rate of "the number of significant QC exceptions found divided by the number of loans reviewed."  In the memo he provided the historical defect rates:

Comparison of target defect rates to historical 2010 post-closing QC exceptions:

| Exception Type | Q2 | Q3 | Q4 | Avg. | Target | Q4 Diff. | Avg. Diff. |
|---|---|---|---|---|---|---|---|
| Underwriting | 32% | 33% | 26% | 30% | 15% | 11% | 15% |
| Compliance | 32% | 23% | 21% | 25% | 15% | 6% | 10% |

207.  The memorandum made clear that Guild's quality control staff regularly found that almost a third of the loans reviewed had significant underwriting errors.

- 78 -

McGarry, however, was unconcerned with these results because she did not think the numbers were accurate and believed this memorandum was just the beginning of tracking a defect rate and bringing attention to it.

208.  Yet Guild did not begin calculating and reporting a defect rate until late 2012, when Fannie Mae uncovered Guild's wholly deficient quality control and required that Guild completely revamp its quality control program.  When Guild did finally begin to determine a defect rate in October 2012, it consistently found defects in over half of its loans and found significant defects that raise serious concerns with the origination and underwriting in nearly 20 percent of loans.

209.  Once Guild was forced to calculate an error rate and set a target defect well below the extremely high defect rates they found, Guild initiated a series of quality initiatives to improve its underwriting.  These efforts continued into 2013 when Klika (the head of Guild's quality control program) in editing a quality control report to the board of directors, changed a bullet from "many of these errors are one-offs that are better addressed by training reminders and individual follow-up" to "[m]any of these errors are one-offs that have been addressed by training reminders and individual follow-ups thus far."  In making this change, however, Klika noted "I'm not as optimistic about training reminders and individual follow-ups being all that effective (as opposed to mandated company-wide training, as you note or other options).  For that reason, I didn't think it was appropriate to convey too much confidence here.  I think this is what we've done to date, but not sure we are seeing the improvements we'd like to see."

- 79 -

210.   Guild's outside quality control vendor, Quest, did calculate and report an "Elevated Risk" percentage beginning in 2010. This "Elevated Risk" percentage represented loans that were found to be an "unsatisfactory" or "prohibitive" risk to Guild. Some of the characteristics of a loan receiving an unsatisfactory risk rating include: "oversights or defects have caused significant processing and/or underwriting documentation and computations to be incomplete or inaccurate; information important to the quality of the credit decision was not identified or purposely not communicated to the final approver; important approval conditions were not met and/or were not reviewed and adjusted by the final approver; material regulatory compliance deficiencies were noted; a credit decision with a poor ranking represents an unacceptable risk to the company."  A prohibitive risk indicated a "clear disregard for any requirement or guidelines; material misrepresentation or fraud."

211.   While Guild sometimes circulated the Quest report that contained this information, Guild managers focused on the report created by Guild's internal quality control department that summarized the Quest report known as the "trend report."  The trend report never included the elevated risk rating from Quest.

212.   This was so despite HUD requiring that Guild's "Quality Control reviews . . . thoroughly evaluate [Guild's] origination . . . functions to determine the root cause of the deficiencies" reported. *See* HUD Handbook 4060.1, REV-2, REV-2, ch. 7-3.F. Upon finding patterns -- or trends -- of deficiencies, HUD also required Guild to expand both the

- 80 -

1  number of files subject to Quality Control review and depth of those Quality Control

2  reviews. *See id.*

3     213.  In 2010, nearly a third of the loans Quest reviewed (29 percent) had an

4  elevated risk.  As Guild ignored this default rate, the findings stayed the same in 2011.

5  Again, nearly a third of the loans Quest reviewed (29 percent) had an elevated risk.

6     **D.   Guild Conducted Incomplete, Ineffective and Unstructured Trending
       Analyses That Failed to Address Underlying Underwriting Issues.**

7     214.  Guild was not even following its own internal guidelines in conducting quality

8  control.  Guild's Quality Control Manual requires that the findings "are summarized for

9  senior management on a monthly or quarterly basis documenting specific areas of

10  deficiencies including errors and omissions, unacceptable patterns or trends, as well as

11  fraud and intentional violations of regulations."  Where patterns emerge, the Quality

12  Assurance group "will expand the scope of the review."  The deficiencies identified "must

13  be addressed immediately by management and appropriate action taken to correct all

14  deficiencies."  Finally, Guild's Quality Assurance group "maintains the documentation of

15  such corrective procedures and makes sure that all information is distributed to the

16  appropriate loan origination, underwriting, appraisal, or servicing personnel."

17     215.  No formal, written quarterly Post-Closing Analysis reports were completed

18  by Guild for 10 of 16 quarters between 2006 and 2009. While often delayed, Guild's third

19  party quality control vendor, Adfitech, always provided Guild with the initial quality

20  control review.  But Guild staff regularly failed to distribute the findings to senior

21

22

- 81 -

management.  Furthermore, for these months, Guild failed to document the specific areas of deficiencies, analyze if the scope of the review should be expanded, or immediately address the deficiencies, as called for by its Quality Control Manual and required by HUD. *See* HUD Handbook, 4060.1, REV-2, ch 7-3.F.

216.   In each of 2006, 2007, and 2009, Guild failed to perform quality control for three annual quarters of those years.

217.   In 2008, Guild completed quality control reports for three of the four annual quarters, but even in those three quarters the quality control report was delayed, completing the report nine to ten months after the first loans of each quarter closed.

218.   FHA further requires that a lender review every loan with an early payment default.  *See* HUD Handbook 4060.1, REV-2, ch 7-6.D.

219.   Notwithstanding this requirement, until 2010, Guild management did not review all early payment defaults as required.  Instead, Guild management only reviewed early payment defaults on loans it retained for servicing and therefore was not analyzing the errors present on early payment defaults where it originated and underwrote the loan, but sold the servicing rights to the loan. Guild management did not begin reviewing all early payment defaults until HUD found the problem through a review in 2010 and forced Guild to fix their faulty quality control.

220.   Even when Guild's Quality Assurance group completed the quality control process through to the post-closing analysis memorandum – the review of loan quality

audits was insufficient. Guild was merely reiterating the findings from their third party vendor and was not independently reviewing or verifying those findings.

221.   Findings were not regularly shared with underwriters or their managers. One of the managers, Melstrand, confirmed that it would have been helpful to know which loans her staff underwrote that failed to comply with FHA Guidelines because she "could help train the underwriters."   But in her role as the Assistant Vice President for National Underwriting and prior to that as the Corporate Underwriting Manager, Melstrand confirmed that she did not regularly receive the results of quality control reviews.

222.   Similarly, Katharina Foster, Guild's former Vice President of Underwriting, stated under oath that she had also not received the findings from the Quest or Adfitech quality control reports.   She had also never seen a Guild post-closing analysis memorandum.

223.   The reports that Adfitech and Quest sent to Guild often contained loan level findings that did not make it into summaries for senior management highlighting major issues in sections of their review such as the "Unsatisfactory and Prohibitive Loan Report." Reflecting on the complicated nature of loan level details, CEO Marry Ann McGarry stated, "I don't get involved in that."   Senior staff only discussed and reviewed cherry picked findings presented by Guild's Quality Assurance group.

224.   This practice violated even Guild's own internal policies. The 2006 version of Guild's Quality Control Manual required that "all discrepancies are summarized for senior management and head of Underwriting," so that "adverse trends for underwriters

- 83 -

will be reported and put on the quality control watch list for increased sampling, if appropriate."

225.   Guild's quarterly quality control memoranda, however, did not comply with Guild's own quality control plan as they were "only reporting those findings that appear frequently enough to demonstrate a trend."   In practice, Guild only presented deficient loans to its senior management if its quality control staff believed them to be part of a trend. This prevented Guild's management from learning the true state of Guild's deficient underwriting because management did not see the entire representative sample.   Patently deficient and extremely risky loans that were not part of an identified "trend" were not presented to senior management for review and remediation.   During the Lending Time Period Guild's management failed to remedy this lack of full insight into the full quality control results.

226.   As part of the standard quality control process, QA staff would send out requests for additional information regarding certain deficiencies. The responsible party, often an underwriter, was supposed to respond to the issue and include any additional information that could rectify the issue, such as if they actually had a missing document. However, Guild sent these requests extremely delayed, if at all, and experienced chronically low rates of responses. The lack of response indicates that in many instances, the deficiencies were simply ignored.

Case No. 16cv2909 (JAH/BLM)

E.   **Guild's Investor Suspense Reports Indicated Patterns of Major Deficiencies in Its FHA Lending Practices.**

227.   Like most loan origination companies, Guild sold most of the FHA loans it originated to investors in the secondary market.  These investors regularly reviewed some of the loans purchased from Guild and discovered defects with the loans.  The investor would either suspend the purchase of the loan or require Guild to buy back the loan if Guild could not remedy the defect. Guild compiled all of these defects into a report entitled "Investor Suspense/Problem Loans."  Some of the issues were mistakes where Guild failed to send all of the documents required by the investor and could supplement with the missing document.

228.   Others went directly to the heart of whether the loan was eligible for FHA insurance, for example overstating a borrower's income or overstating the borrower's investment in the property, *i.e.* the borrower's skin in the game.

229.   This report was regularly distributed to various members of senior management and discussed in a "Problem Loan" meeting. The regular attendees included CEO McGarry; Director of Operations Blocker, Director of Underwriting Foster, and CFO Terry Schmidt, among others.  This report and meeting put senior management on notice of Guild's faulty underwriting.

230.   Quality control staff at Guild did not regularly attend the meetings where problem loans were discussed until 2010 when Dougherty was hired as the Quality

- 85 -

Assurance Manager. Furthermore, Guild did not track or trend the investor suspense findings, and did not build the investor suspense findings into its quality control program.

231.   Had Guild tracked and trended investor suspense findings, Guild would have been aware of trends that negatively impacted the performance of its FHA loans, including that nearly a third (17 out of 55 or 30.9 percent) of suspended FHA loans underwritten between 2008 and 2011 were underwritten by only 5 underwriters.  Additionally, the DTC branch, for which Guild was already ignoring audit findings and high rates of FHA loan defaults, accounted for almost 10 percent of the FHA loans that were suspended between 2008 and 2013.  Additionally, approximately 20 percent of suspended FHA loans during that time were underwritten in Washington State.  Nonetheless, Guild neither tracked nor trended the investor suspense findings nor included quality control staff responsible for tracking and trending issues related to quality in the investor suspense process.

232.   Similarly, Susan Jarvis, the person with primary responsibility for investor suspense reports was not included in quality control meetings. While there was some overlap in the attendance at investor suspense meetings and quality control meetings, there was no individual whose primary responsibility was tracking quality or investor suspense reports and who could ensure the errors found by each were properly communicated and remediated.

233.   Furthermore, the investor suspense meeting did not improve the quality of the loans Guild originated and underwrote, even though the meeting clearly identified areas of

- 86 -

underwriting problems and violations of HUD policy.  The investor suspense meeting was purely financial in nature; an attempt to salvage the sale of these bad loans.

### F.    Failure to Disclose Known Violations to HUD as Required Under the DE Program.

234.   As explained in Paragraphs 81 to 82 above, Guild was required to report to HUD loans that presented material risk and "[f]indings of fraud or other serious violations" that are discovered during the "normal course of business and by quality control staff during reviews/audits of FHA loans."  HUD Handbook 4060.1, REV-2, ch. 7-3.J, 7-4.D; HUD Handbook 4060.1, REV-2, ch. 2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices.").  Indeed, HUD required Guild to ensure that findings discovered through its quality control program were reported to HUD within 60 days of the initial discovery.  *See* HUD Handbook 4060.1, REV-2, ch. 7-3.J.

235.   Guild's Quality Control Manual recognized the duty to self-report, and stated that "loans confirmed to contain false information or violation of regulations are reported to the appropriate investor, VA or HUD regional office."  The director of quality control held primary responsibility for self-reporting.

236.   However, Guild did not follow this practice.  Rather than report deficient loans identified through its quality control reviews to HUD so that HUD could exercise its regulatory authority and insist that Guild take corrective actions, Guild failed to report any deficient loans to HUD.

237.    Notably, Guild's own Quality Control Manual echoed HUD requirements that DE Lenders, such as Guild, must report serious violations, including "violations of regulations."

238.    Regardless, Guild failed to notify HUD of any loans with serious underwriting deficiencies committed by Guild, even when it concluded internally that loan approval was not justified.

239.    For example, Quest reviewed FHA loan 045-6620827.   Quest reported to Guild that the loan file contained two copies of the first page of a bank statement.   Both copies had the same statement date but the ending balances were different.   Quest suggested that Guild follow up with the borrower's bank to determine if there was a misrepresentation.   Guild confirmed the file contained a fraudulent bank statement. However, Guild did not self-report the loan until six months after the Department of Justice informed Guild of the Government's investigation of this matter.

240.    In 2013, Klika addressed an Audit Committee Agenda item titled "FHA Subpoenas to Industry."   During the meeting notes were taken that indicated:

> Lisa noted that many large lenders were receiving subpoenas from FHA regarding false claims.  She explained that FHA is reviewing the lenders' QC results going back six years to find loans that should have been reported to FHA but were not.

It was not until a month after this meeting that Guild reported its first loan to HUD on June 18, 2013.  As part of this process, Guild reported nineteen loans from the Lending Time Period as materially deficient.

241.    During this look-back review, which went through April 2014, Guild reviewed old FHA loans to determine if any loans should have been reported. However, Guild was not forthcoming with HUD during this look-back project. During the review of one loan Guild found a new reportable material violation in FHA case number 121-3030442 but, as it was not found at the time the loan went through the original quality control, Guild did not report it saying: "The Quest audit finding never addressed this, specifically. It was discovered during our own secondary review of the file. Considering we did not address it (waived it), I'd rather delete my reference to it in the event of an FHA audit."

242.    Guild systematically concealed poorly underwritten FHA loans by choosing not to report loans with known fraud, misrepresentations, or serious violations of HUD rules. Guild senior staff knew that some loans Guild certified as in compliance with regulations were in fact fraudulent or contained serious violations of the regulations. Guild senior staff withheld this information from HUD by not following Guild's own internal reporting requirements and by ignoring the HUD requirement to do so.

## V.    GUILD SUBMITTED AND CAUSED TO BE SUBMITTED FALSE CLAIMS FOR PAYMENT TO HUD.

243.    The loans discussed in this complaint are representative examples of false claims that Guild knowingly submitted or caused to be submitted to HUD. The loans are emblematic of the loans Guild falsely certified for FHA insurance and are products of the

- 89 -

systemic practices and procedures followed by Guild that led to the submission of false statements and claims.

244.  HUD paid all of the claims associated with the loans discussed in this complaint.  These claims were false because the loans were not eligible for FHA insurance, and Guild falsely certified to the integrity of the data that was used to approve the loan for FHA insurance and its compliance with HUD requirements (for loans approved through the use of an AUS), or falsely certified that the loan was underwritten using due diligence in accordance with HUD guidelines (for manually underwritten loans).

245.  Guild caused to be submitted, and made false statements regarding, hundreds of additional false claims, causing the United States to suffer tens of millions of dollars of damages.

## COUNT I
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(A)(1) (2006) and 31 U.S.C. § 3729(A)(1)(A) (2010)

246.  The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 245 above, as if fully set forth herein.

247.  Guild violated the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006) and 31 U.S.C. § 3729(a)(1)(A) (2010), by knowingly presenting and causing to be presented to HUD false and/or fraudulent claims for payment.

248.  Specifically, Guild made, and caused to be made, false claims for FHA insurance payments by, during the Lending Time Period, originating, underwriting,

Case No. 16cv2909 (JAH/BLM)

endorsing, and insuring loans for FHA mortgage insurance that failed to comply with FHA requirements.

249.   By endorsing ineligible mortgages for FHA insurance Guild fraudulently induced the United States to enter into a mortgage insurance contract that it would not have otherwise entered into, rendering the subsequent claim for mortgage insurance false as a matter of law.

250.   Also, where Guild submitted a claim on HUD Form 27011 or its electronic counterpart for a loan that Guild falsely endorsed for FHA mortgage insurance, the claim gave an FHA case number and the date of the loan's endorsement for FHA insurance while failing to disclose that the loan did not qualify to be endorsed for FHA insurance pursuant to the above authorities and that FHA could contest the contract for insurance and not pay the claim, pursuant to 12 U.S.C. § 1709(e), because of Guild's fraud or misrepresentation in originating the loan.

251.   Further, where a subsequent holder of a loan that Guild falsely endorsed for FHA mortgage insurance presented a claim on HUD Form 27011 or its electronic counterpart, the claim gave an FHA case number and the date of the loan's endorsement for FHA insurance while failing to disclose that the loan did not qualify to be endorsed for FHA insurance pursuant to the above authorities because Guild failed to disclose that the loan did not qualify for FHA insurance.

252.   These false claims for FHA mortgage insurance payments were material as they led the Government to make payments that, absent the falsity, it would not have made.

- 91 -

253.   Guild, through its senior management, had actual knowledge that these claims were false or acted with deliberate ignorance or reckless disregard as to their falsity as evidenced, in part, by the facts described above.

254.   As a result of the false claims caused by Guild's improper practices during the Lending Period, the United States was damaged by making insurance payments it would have otherwise not been required to make in an amount to be determined at trial.

255.   The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

## COUNT II
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(A)(1)(B) (2010) (formerly 31 U.S.C. § 3729(A)(2) (2006))

256.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 245 above, as if fully set forth herein.

257.   Guild violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2010) (formerly 31 U.S.C. § 3729(a)(2) (2006)), by knowingly making, using, or causing to be made or used, false records, or statements: (i) material to false or fraudulent claims for payment to HUD; and/or (ii) in order to get false or fraudulent claims paid; and (iii) which claims the United States did pay.

258.   Specifically, Guild falsely represented to HUD that it had complied with requirements for issuing FHA insurance to loans (including, but not limited to origination, underwriting, and endorsement) during the Lending Time Period when it fact it had not. Those false certifications made on standard HUD forms at the time of a loan's endorsement

were material to the claims for mortgage insurance on that loan, which claims were false for the reasons summarized above in Paragraphs 248 to 251 and stated elsewhere in this Complaint.

259.   These false statements, and the records containing these false statements, were material to false claims for FHA insurance payments on loans that Guild failed to originate, underwrite, endorse, and insure in accordance with FHA requirements.

260.   Guild's false statements were material to these false claims as they had a natural tendency to influence and were capable of influencing the Government to make payments that, absent the falsity, it may not have made.

261.   Guild, through its senior management, had actual knowledge that its statements were false or acted with deliberate ignorance or reckless disregard as to their falsity as evidenced, in part, by the facts described above.

262.   As a result of Guild's false statements during the Lending Period, the United States was damaged by making insurance payments it would have otherwise not been required to make in an amount to be determined at trial.

263.   The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

## COUNT III
## BREACH OF FIDUCIARY DUTY

264.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 245 above, as if fully set forth herein.

- 93 -

265.   As a DE and LI Lender, Guild is a fiduciary of HUD and owes HUD fiduciary duties.

266.   As a fiduciary of HUD, Guild has a duty to act for, and give advice to, HUD for the benefit of HUD as to whether particular loans should be endorsed for FHA insurance under the DE Program.

267.   As a fiduciary of HUD, Guild owes HUD a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with HUD.  These duties require, among other things, that Guild (1) refrain from making misrepresentations to HUD; (2) make full and fair disclosures of all material facts to HUD; and (3) use reasonable care to avoid misleading HUD or abusing HUD's trust.  Guild must therefore exercise integrity, prudence, candor, and due diligence on behalf of HUD when endorsing loans for FHA insurance, reviewing the loans for quality control purposes, and submitting claims.

268.   As set forth above, Guild breached its fiduciary duties to the FHA and HUD during the Lending Time Period.

269.   As a result of these breaches, HUD has paid insurance claims, and incurred losses, relating to hundreds of FHA-insured loans wrongfully endorsed by Guild.

## COUNT IV
## BREACH OF CONTRACT

270.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 245 above, as if fully set forth herein.

Case No. 16cv2909 (JAH/BLM)

271.   Guild entered into a contract with HUD for each loan that it endorsed for FHA mortgage insurance.

272.   Under the terms of that contract, in committing FHA insurance to the loan Guild represented it complied with, and obligated it itself to comply with, FHA origination, underwriting, endorsement, and other insurance requirements.

273.   Guild breached its obligations by failing to comply with these FHA requirements during the Lending Time Period.

274.   Guild's breach caused FHA to make FHA insurance payments it was not obligated to make.

275.   As a result of these breaches, HUD has paid insurance claims, and incurred losses, relating to hundreds of FHA-insured loans wrongfully endorsed by Guild.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff United States of America prays for judgment against the Defendant as follows:

A.   As to Counts I and II under the False Claims Act, 31 U.S.C. § 3729(a), against Guild, for treble the amount of the United States' single damages to be proven at trial, plus civil penalties as are required by law, which currently are on the range between $5,500 and $11,000 per violation of the False Claims Act, post-judgment interest, costs, and such other relief as may be necessary and proper;

B.   As to Count III, the Government is entitled to money damages;

C.   As to Count IV, the Government is entitled to money damages; and

- 95 -

Case No. 16cv2909 (JAH/BLM)

1    D.    Such other relief as the Court deems just and proper.

2         THE UNITED STATES DEMANDS A TRIAL BY JURY
              AS TO ALL ISSUES SO TRIABLE.

3
                              Respectfully submitted,
4
                         JOSEPH H. HUNT
5                        Assistant Attorney General

6                        ROBERT S. BREWER, JR.
                         United States Attorney
7
                         By:    /s/ Brian P. Hudak
8                            BRIAN P. HUDAK
                             Special Assistant United States Attorney
9                            555 Fourth Street, NW
                             Washington, DC 20530
10                           (202) 252-2549

11                           JOSEPH P. PRICE, JR.
                             Assistant United States Attorney
12                           880 Front Street, Room 6293
                             San Diego, CA 92101-8893
13                           (619) 546-7642

14                       MICHAEL D. GRANSTON
                         SARA MCLEAN
15                       SAMUEL J. BUFFONE
                         CHRISTOPHER R. B. REIMER
16                       JOHN W. BLACK
                         BRUCE D. BERNSTEIN
17                       Attorneys, Commercial Litigation Branch
                         P.O. Box 261, Ben Franklin Station
18                       Washington, DC 20044
                         (202) 616-2945
19
                         *Attorneys for the United States of America*
20   Dated:  March 4, 2019

21

22                              - 96 -
                                     Case No. 16cv2909 (JAH/BLM)